**Dwight A. LONG**

v.

**ABBOTT MORTGAGE CORPORATION, a/k/a Abbot Mortgage & Loan Corporation, et al.**

**Civ. No. N–74–133.**

United States District Court, D. Connecticut.

Aug. 8, 1978.

---

Louis Winer, New Haven, Conn., for plaintiff.

Ira B. Grudberg, Jack Barnston, William Gallagher, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

### INTRODUCTION

In May, 1971, the *New Haven Register,* a daily paper of general circulation, carried an advertisement offering an opportunity to invest in mortgages with a "13–15% GUARANTEED RETURN." Dwight A. Long, a retired businessman, responded to the ad and during the next eighteen months invested well over $100,000 in nine mortgages through the defendant Abbott Mortgage Corporation (formerly "Abbot Mortgage and Loan Corporation," hereinafter "Abbott"). Abbott went into state receivership in November, 1974, and Long seeks to recover his losses through this action.

 Long brings this action under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, and under the Connecticut Securities Act, Conn.Gen.Stat. §§ 36–338 and 36–346 (1969).[1] During trial plaintiff sought to add negligence counts against

---

1. Plaintiff's state law claims raise a threshold issue of statutory construction which both plaintiff's and defendants' briefs fail to discuss. The Connecticut securities fraud statute, Conn. Gen.Stat. § 36–338 (1969), which essentially tracks the language of Rule 10b–5, and the statute creating a private cause of action for a violation of that provision, Conn.Gen.Stat. § 36–346(a) (1969), were both repealed in June, 1977, *after the case was filed but before trial.* Conn.Gen.Stat.Ann., P.A. 77–482 § 21 (1978 App.Pamp.). The substantive fraud provision was reenacted in virtually identical language by the same statute. P.A. 77–482 § 3. The provision creating a cause of action, however, was substantially changed. P.A. 77–482 § 30(a)(2). Rather than simply create a cause of action for a violation of § 3 (formerly § 36–338), which tracks Rule 10b–5, § 30 spells out the elements of a cause of action. This language, taken from the Uniform Securities Act, is almost identical to § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). *See Hitchcock v. deBruyne,* 377 F.Supp. 1403, 1405 (D.Conn.1974). Thus there is a substantial difference between the statute relied on by the plaintiff throughout this litigation, and the statute which was actually in effect before the trial began.

Fortunately, the rules of *statutory construction* applicable in Connecticut obviate this problem. The Connecticut statutes themselves provide that "[t]he repeal of an act shall not affect . . . any suit, or prosecution, or proceeding pending at the time of the repeal . . . ." Conn.Gen.Stat. § 1–1(t) (Supp. 1978). Similarly, the Connecticut Supreme Court has held that "[i]t is a rule of construction that statutes are not to be applied retroactively to pending actions, unless the legislature clearly expresses an intent that they shall be so applied." *New Haven v. Public Utilities Comm'n,* 165 Conn. 687, 726, 345 A.2d 563, 583 (1974). There is nothing in P.A. 77–482 which indicates that it is to be applied retroactively. Therefore, as to this suit, which was pending at the time of its enactment, the new statute has no effect and the state law claims will be considered under the now repealed provisions of Conn.Gen.Stat. §§ 36–338 and 36–346(a) (1969).

two individual defendants.[2] The defendants include not only Abbott itself but four individuals who were associated with Abbott during the period May, 1971, through December, 1972, when plaintiff was making his investments. Defendant Joseph Croog was both President and a director of Abbott from 1953 through 1974. His participation diminished after 1969, however, and active control was in the hands of his son, defendant Ralph Croog, who was Vice-President, Treasurer, and a director of Abbott from 1953 through 1974. The third individual defendant is David B. Greenberg, a New Haven attorney, who incorporated Abbott and served as Secretary and a director from 1953 until his resignation from both positions on April 7, 1971. He was also a shareholder and did legal work for the corporation between 1953 and 1974. The fourth individual defendant is Sidney S. Silverberg, who was elected Secretary and a director on May 19, 1971. He resigned those two roles on April 9, 1973, and September 21, 1973, respectively. A nine-day trial was held without a jury.

I find that plaintiff is not entitled to recover against any defendant, on either his federal or his state law claims.

### I. *The Statute of Limitations Defense*

Plaintiff's threshold obstacle is defendants' claim that the statute of limitations bars recovery as to all but the final transaction. A prior ruling determined that the two-year limitations period of Conn.Gen. Stat. § 36–346(e) is applicable to both the federal and state claims. *Long v. Abbott,* 424 F.Supp. 1095 (D.Conn.1976). This action was commenced on June 3, 1974, and it is uncontested that seven of the plaintiff's nine transactions occurred before June 3, 1972. The timing of the eighth is in dispute,[3] and the ninth clearly falls within the limitations period. Thus recovery on at least seven of the nine transactions would be barred but for plaintiff's claim that the statute was tolled until at least June 3, 1972.

The prior ruling determined that federal tolling principles applied to the federal claims and state tolling provisions applied to the state claims. Because the application of both doctrines requires the resolution of factual issues, the ruling deferred decision on the statute of limitations defense until trial. It is now appropriate to examine the tolling principles in more detail and to apply them to the facts developed at trial. I

---

**2.** The complaint was originally filed on June 3, 1972, and an amended complaint was submitted on July 10, 1975, with leave to file it granted December 19, 1975. The plaintiff then sought to amend the amended complaint shortly before trial, on November 24, 1976, and again during trial, on December 23, 1976. Decision on the amendments was reserved until after trial. As to that portion of the motion which seeks to amend ¶ 20 of the amended complaint by adding a substituted subparagraph (b) and by adding additional subparagraphs (m) and (n) alleging additional material facts not disclosed, the motion is granted. That portion of the motion which seeks to add a third and fourth count sounding in negligence is more problematic.

The essence of plaintiff's negligence theory apparently is that defendants Silverberg and Greenberg as director and director/attorney respectively knew of Abbott's financial difficulties and were negligent in not notifying investors of those difficulties. There are numerous problems with this theory. Aside from the failure of plaintiff to consider the statute of limitations defense to this claim, he makes no attempt to demonstrate the existence of a duty running from a director to an investor in circumstances such as these. Rather plaintiff simply relies on the conclusory allegation that "under familiar principles . . . he was required to act with due care." (Plaintiff's brief at 120). Plaintiff has not only failed to show that any duty existed, but failed to provide any authority for what the standard of care is, why the defendants' conduct fails to meet that standard, or why the conduct was the proximate cause of the plaintiff's injury. In short, Counts Three and Four as proposed, and as briefed after trial, fail to state a claim on which relief can be granted. The motion to amend the complaint to include them is therefore denied.

**3.** As to the Pusey Mortgage Trust transaction, the plaintiff argues that because he did not receive documentation of the transaction or a copy of the trust agreement until after June 6, 1972, the transaction was not completed until that time. I need not resolve this issue, however, in light of my decision, *infra,* that even if not time-barred, the plaintiff cannot recover on this transaction.

turn first to the federal claims and federal tolling principles.

## A. *Federal Tolling*

Plaintiff relies on the federal doctrine of equitable tolling enunciated in *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874). The Court ruled that in a federal action to recover for fraud the limitations period was tolled "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part . . . until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Id.* at 348. (footnote omitted). The equitable tolling doctrine has been applied when state law provided the statute of limitations, *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946), and in this Circuit has been applied to actions at law. *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 85–86 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961).

█ The equitable tolling doctrine does not come into play, of course, until the defendant has claimed that the plaintiff's cause is time barred. The burden then shifts to the plaintiff to demonstrate that the statute should be tolled. As the Second Circuit put it,

> "[o]nce it appears that the statute of limitations has run, the *plaintiff* must sustain the burden of showing not merely that he failed to discover his cause of action prior to the running of the statute of limitations, but also that he exercised due diligence and that some affirmative act of fraudulent concealment frustrated discovery notwithstanding such diligence.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 461 (2d Cir. 1974) (emphasis in original). The two elements of equitable tolling were first articulated in *Bailey, supra,* where the Court held that "[1] when there

has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud . . . and [2] when the fraud has been concealed, or is of such character as to conceal itself, [then] the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing . . . ." 88 U.S. (21 Wall.) at 349–50.[4] Both elements require consideration, first, whether the plaintiff was without fault for his ignorance, that is, was he "diligent," and second, whether or not there was "concealment."

### 1. *Plaintiff's Diligence*

█ The essence of equitable tolling is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action. The statute only begins to run "when the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *Detroit, supra,* 495 F.2d at 461. In deciding whether plaintiff "knew or should have known" of the defendants' conduct, it must be determined first whether plaintiff was aware of any facts sufficient to put him on notice, thereby creating an obligation of diligence, and if so, whether plaintiff fulfilled that duty of diligence.

The inquiry, of course, is not whether the plaintiff knew of facts sufficient to put him on notice before he entered his first transaction, but rather whether he learned such facts at any time prior to June 3, 1972—a date two years before the suit was filed. The plaintiff's brief is regrettably imprecise in specifying which of the defendants' practices were fraudulent and why. For purposes of resolving the statute of limitations issue, however, it is unnecessary to unravel the myriad allegations and recast them as specific legal claims. It is sufficient to describe the general nature of the scheme complained of and consider whether plain-

---

**4.** The language of *Bailey* and of the Second Circuit in *Detroit, supra,* appear inconsistent as to whether or not affirmative concealment by a defendant is a necessary element of equitable tolling. This matter will be considered in detail *infra,* at p. 117 *et seq.*

tiff was sufficiently aware of its essence to be charged with an obligation of due diligence.

Plaintiff seeks damages arising from a series of investments he made in mortgages sponsored by Abbott. Abbott's practice was to loan money to a mortgagor and then sell fractional shares of the mortgage to individual investors, including plaintiff. This syndication of mortgages used a trust agreement that named Abbott as trustee, and investors as beneficiaries of the underlying mortgage, which was the trust *res*. Abbott as a corporation also undertook to guarantee the investments of the individual participants, providing recourse against the corporation in the event of a mortgagor's default.

Plaintiff's claims of fraud fall into two general categories—the nature of the investments themselves and the management of the enterprise. As to the investments, plaintiff claims that the "guarantee" of investments by Abbott was misleading because of the high ratio of contingent liabilities to the corporation's equity, and because of the failure to disclose that ratio. He also attacks the representations made about the value of the property being mortgaged because the valuations were done by defendant Ralph Croog, an officer of Abbott, rather than by an independent appraiser. Finally, he challenges the non-disclosure of origination fees and real estate commissions paid to Abbott and its sister corporation, the Joseph Croog Company.

Plaintiff also alleges fraudulent mismanagement of Abbott's affairs including, inter alia, the comingling of money held as trustee with general funds and the use of later investors' deposits to make payments to earlier investors after a mortgagor defaulted. In addition, plaintiff alleges inadequate record keeping and non-compliance with state and federal securities laws. A review of the record developed at trial reveals that plaintiff knew enough facts to put him on notice of many of the practices complained of, but that his efforts to investigate were minimal at best.

■ Turning first to the investments, the plaintiff was on notice from the beginning they were somewhat risky. His first contact with Abbott came through a newspaper advertisement in May, 1971, offering a "13% to 15% GUARANTEED RETURN . . . .. INVESTMENT FULLY GUARANTEED." When questioned by the Court, plaintiff admitted that he realized that the high interest rate reflected an element of risk, but said that he "didn't give it much particular thought at the time." (Tr. 822). In view of the prevailing rate of return on other investments available in the financial market place, a reasonable investor certainly would have been aware that such a high yield was very unusual and that fact alone should have put plaintiff on notice of the need for serious scrutiny. However, it appears that before making his first investments the plaintiff's only investigation was a check with Abbott's bank and with the real estate board. (Tr. 662). Although he consulted an accountant at some point during the course of his investments (Tr. 663–64), there is no evidence that he ever initiated an inspection of the mortgaged property, sought to meet a mortgagor, or otherwise undertook any independent investigation of the underlying investments.

Even if the high interest rate did not put the plaintiff on notice, the default of some early mortgage investments should have. Plaintiff's first investments occurred in May of 1971 when he paid $4,950 for an approximately one-eighth share in a $40,000 mortgage taken out by Adanac, Incorporated. That note was due in March of 1972, a fact plaintiff was aware of. Plaintiff received only $750 of the principal by April 12, 1972—14 days after the entire mortgage was due. He also knew that Abbott had extended the note for another year. (Tr. 783–787). Despite this knowledge of default, knowledge he had well before June 3, 1972, plaintiff did nothing other than discuss it with Ralph Croog until more than a year later. (Tr. 790–91).

Plaintiff participated in another mortgage to Adanac in January, 1972. This mortgage, in the amount of $70,500 was a

refinancing of an $80,000 loan which had been made in January, 1970, and which was due on January 14, 1972. Plaintiff received a copy of the agreement extending the loan and reciting that $70,500 of the $80,000 was past due. Although plaintiff denied remembering the receipt of that agreement, he admitted it was in his file and that he had noted its receipt. (Tr. 791–795). Thus plaintiff was aware at the time of his investment, in January, 1972, that he was investing in the refinancing of an $80,000 loan which had paid only $9,500 in its two-year term. This too should have put plaintiff on notice to investigate the general quality of this and other investments.

Plaintiff specifically claims the "guarantee" of investments by Abbott was fraudulent because it was meaningless in light of Abbott's high ratio of contingent liability to equity. If the high rate of interest alone was not enough to prompt an inquiry by a reasonable investor, the "guarantee" of that rate certainly should have. But again, plaintiff did nothing to investigate the basis for such a representation. By his own admission he never discussed the guarantee with anyone from Abbott because he viewed it as "self explanatory" (Tr. 594), and thought such a discussion "wasn't necessary." (Tr. 597–98).

To the extent plaintiff attributes the fraud of the guarantee to the relationship between contingent liability and corporate equity, he was on notice before June 3, 1972. Plaintiff admitted he knew that Abbott's equity was $192,000 as of June, 1971, and by that point he personally had invested in mortgages in excess of $200,000. (Tr. 690). Moreover, as he continued his investments he knew by June 1, 1972, that Abbott had guaranteed over one million dollars in mortgages. (Tr. 624, 691). Thus plaintiff knew of both the approximate potential liability and the equity of the corporation well before June 3, 1972. Although at trial he claimed not to have ever consciously related the two figures, he certainly knew enough to be put on notice of the relationship between potential liability and equity about which he now complains.

Plaintiff also claims that the valuation of the land which underlay the mortgages was fraudulent both as to amount and because the valuations were done "in house" by Ralph Croog, a fact not disclosed to the plaintiff. In attempting to explain his failure to relate the potential liability to the corporate equity or to investigate the nature of the guarantee, plaintiff consistently testified that he relied primarily on the value of the land to protect his investment. (E. g., Tr. 627, 687, 688, 691, 817). Although there does not appear to be any specific information or event that should have put plaintiff on notice with respect to irregularities in property valuation, his heavy—indeed exclusive—reliance on the value of the property as a means of protecting his investment would have prompted a reasonable investor to make at least a cursory inquiry into the value of, or at least the method of valuing, the property being mortgaged. Before the plaintiff's first investment, however, he did not inspect any property. Indeed during the whole period of investments he saw only one property and talked to only one mortgagor. (Tr. 602). He accepted Abbott's valuation on faith and never even asked what the source of the valuations was. To the extent he knew that a property's equity was his assurance of a sound investment he was on notice of the need to investigate the value of the individual parcels.

If the general situation was not enough to put plaintiff on notice, the specific situation presented by plaintiff's third investment in Adanac should have been. In January, 1972, the plaintiff invested $28,000 in an Adanac mortgage. Unlike the other investments that are the subject of this litigation, plaintiff held 100% of this mortgage, rather than a fractional share. At the time of the investment, however, plaintiff received a deed that showed his interest was subject to no less than *42 prior encumbrances*. (Tr. 798). Nevertheless, there is nothing in the record to suggest that plaintiff made any attempt to find out if the equity in the property was sufficient to satisfy all those prior encumbrances and still protect his investment.

The final allegedly fraudulent practice plaintiff complains of with regard to the investments relates to the origination fees and real estate commissions earned by Abbott and the Joseph Croog Company respectively when syndicated mortgages were arranged. In testimony plaintiff admitted that he had assumed Abbott was getting some kind of fee from the borrower, but that he had never bothered to ask how much the fees were (Tr. 680–82), nor did he ever request the closing statement from any of the mortgages, which would have revealed the commissions. (Tr. 660–61). Moreover, the financial statement of Abbott as of November 30, 1971, showed that Abbott had earned over $76,000 in origination fees during the nine months covered by the statement, a figure which represented over 75% of its total income for that period. Certainly this statement, received by plaintiff well before June, 1972, was sufficient to put a reasonable investor on notice to investigate the significance of commissions in the Abbott investment scheme.

Turning from investments to plaintiff's claims of fraudulent mismanagement of Abbott's affairs, there are again facts known to the plaintiff that should have been sufficient to put him on notice of the practices complained of. The essence of plaintiff's complaint is that Abbott was engaged in a "pyramiding" scheme whereby the early investors were not paid from earnings generated by their investments, but from the funds of later investors. Such a scheme succeeds so long as it attracts sufficient new capital to continue payments to the early participants. It collapses when the influx of new money stops and earlier obligations cannot be met. In plaintiff's view, Abbott operated and collapsed in precisely this way. For purposes of the statute of limitations issue it is not necessary to resolve the merits of plaintiff's claim, but only to decide if the essential elements of the alleged scheme were known, or should have been known before June, 1972.

The fraud as alleged by the plaintiff has two correlative aspects. The first is payments, or "advances," made by Abbott to

investors after the underlying investment had in fact failed. The second aspect is that the payments came not from the general resources of Abbott itself, but from funds held by Abbott on behalf of other individuals for later investment. Plaintiff attempts to demonstrate this misuse of funds in part by an analysis of accounting data. (Plaintiff's brief at pp. 31–34). Similar data was available to the plaintiff himself, however, in the financial statement as of November 30, 1971. (Tr. 774–777).

That statement showed an item captioned "Advances as Guarantors to Participants and Mortgage Notes" in the amount of $47,980. The statement also showed that, in the nine months it covered, the cash on hand had shrunk from $26,000 to $7,000, while the amount of money that Abbott was holding as deposits received from participants in mortgage notes had risen from $14,000 to $110,000. While these figures alone certainly do not prove that Abbott in fact misused investors funds, they are at least disturbing enough on their face to prompt a reasonable investor to investigate further.

The preceding facts do not demonstrate, nor is it necessary for them to demonstrate, that plaintiff had actual knowledge of the alleged fraud. They do demonstrate, however, that plaintiff had sufficient notice of the practices complained of to impose on him an obligation to exercise due diligence in discovering the practices he alleges were fraudulent.

As noted above, "the *plaintiff* must sustain the burden of showing . . . that he exercised due diligence . . .." *Detroit, supra,* 495 F.2d at 461 (emphasis in original). He "has the burden of showing that he 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.' *Morgan v. Koch,* 419 F.2d [993,] 997 [(7th Cir. 1969)]. . . ." *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir. 1974).

In deciding if the plaintiff has met his burden, it appears that his conduct should be evaluated with reference to the objective standard of a hypothetical reasonable man,

rather than the subjective standard of a reasonable man with plaintiff's characteristics.[5] Moreover, even if a subjective approach to reasonableness were employed, plaintiff would be held to a higher standard than a hypothetical average reasonable investor because of his background and experience.[6] Under either standard, plaintiff has failed to meet his burden.

His conduct does not begin to approach the level of care necessary to rise to the level of "due diligence." Indeed plaintiff does not even allege such care on his part. On the contrary, the record gives the picture of a casual, almost careless investor, who poured over $100,000 into mortgages in a little over a year with virtually no attempt to investigate the defendants either before investing or even after "warning signals" put him on notice of potential problems.

"Unawareness of facts or law, alone, does not justify suspending the operation of the statute. . . . The plaintiff's indifference to the true facts of the case is not enough to toll the statute." *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969). "Mere ignorance of evidence on which to establish a claim is not enough . . .." *Moviecolor, supra*, 288 F.2d at 87. Plaintiff clearly fails to meet the first prong of the equitable tolling doctrine's two requirements, and I now turn to the second— "concealment."

### 2. Defendants' Concealment

At the outset it should be noted that as to the "concealment" element there appears to be a conflict between the Supreme Court's formulation and the formulation utilized by the Second Circuit. As noted above, in *Bailey* the Court said that a statute of limitations does not run until the fraud is discovered, "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it . . . ." *Bailey, supra*, 88 U.S. (21 Wall.) at 348. Similarly, that decision held that the period of limitations did not begin until plaintiff discovered his cause of action when "the fraud has been concealed, or *is of such character to conceal itself* . . . ." *Id.* at 349–50 (emphasis added). According to *Bailey*, therefore, the concealment element is satisfied not only by affirmative acts of concealment but by mere "unknowability." By contrast, the Second Circuit, although concurring with *Bailey* as to the plaintiff's obligation of "diligence," appears to view "concealment" as requiring affirmative acts by the defendant. In *Detroit, supra*, the Court said that "[i]n order to establish fraudulent concealment, a claimant must show: (1) that defendants concealed the basic facts that would reveal the existence of their monopolistic behavior . . . ," 495 F.2d at 460, and later, the plaintiff must show "that some affirmative act of fraudulent concealment frustrated discovery notwithstanding [plaintiff's] diligence." *Id.* at 461.

The *Detroit* Court cited *Moviecolor, supra*, as authority for its formulation. *Moviecolor* in turn contains the following lan-

5. No case was found which discussed the content of the "reasonableness" standard. Language in the cases describing the standard suggests, however, that it is an objective one. See *Hupp, supra*, 500 F.2d at 997 ("fact which would have put a reasonable person on notice" was not concealed); *Detroit, supra*, 495 F.2d at 461 (statute runs when plaintiff has knowledge or should have acquired it "through the exercise of reasonable diligence"); *Morgan, supra*, 419 F.2d at 998 (from a fact known "the district court found that a reasonable man would have inferred" the true nature of the purchase).

6. Plaintiff was not a naive investor. His net worth at the time of his retirement and before his investments in Abbott was well over $800,-000 (Tr. 578) and included over $200,000 in stocks and bonds (Tr. 573, 586) and a 70% interest in a commercial building valued at $250,000. He had been personally responsible for the development of that real estate (Tr. 580), and was a sophisticated enough businessman to have operated his insurance business through six separate corporations and managed his commercial property through a seventh. (Tr. 579–80). He had also had substantial experience in risk evaluation as the supervisor of health and accident underwriting for Mutual of Omaha for fifteen years. (Tr. 581). Finally, he had substantial experience dealing with stockbrokers, attorneys, and accountants in connection with his financial affairs. (Tr. 587–88).

guage: "[e]ven if no affirmative act of concealment is required in restraint of trade conspiracy cases, in contrast to the usual rule where there is no fiduciary relationship, a point we do not decide . .." 288 F.2d at 87 (citations omitted). This too suggests the Second Circuit views the "usual rule" as being a requirement of affirmative concealment in contrast to *Bailey.* In neither *Detroit* nor *Moviecolor,* however, was this point material to the decision. In *Moviecolor* the Court found that the plaintiffs had actual knowledge at a point early enough to invoke the statute of limitations bar. 288 F.2d at 87–88. In *Detroit* the plaintiffs made no attempt to argue that they were within the standards of the tolling rule; instead, they merely argued that defendants had not alleged actual knowledge by plaintiffs.

Thus, the Second Circuit has not definitively determined whether a plaintiff must establish affirmative concealment or whether a fraud which "conceals itself" is suffi-

cient to toll the statute. I need not resolve this issue, however, for under either standard the plaintiff has failed to satisfy the requirement.[7]

■ Turning first to the more exacting standard, plaintiff has failed to demonstrate that the defendants affirmatively concealed the allegedly fraudulent practices through June 3. 1972. Plaintiff's first claim of affirmative concealment relates to the so-called "seven months report" which revealed the disastrous state of Abbott's financial condition after the seven months ending September 30, 1972. Since the revelation in this report is obviously not a "concealment," plaintiff's claim must be that since certain financial information was revealed for the first time in this report, its earlier non-disclosure constitutes affirmative concealment. Plaintiff points out that this report was the first financial statement to identify "contingent liabilities" specifically (Tr. 197–98), and it was the first to classify "mortgage receivables" as to

---

7. A further ambiguity exists as to the relationship between the two elements of equitable tolling—are both diligence and concealment required or is either alone sufficient to prevent the running of the statute? Policy arguments can be made for the "either . . . or" approach as well as the "both . . . and" approach. It can be argued that when a plaintiff diligently investigates but fails to discover the fraud, that alone should toll the statute regardless of whether the cause of the non-discovery is affirmative concealment, the nature of the fraud or merely fortuitous circumstances. One cannot say the plaintiff "should have known" if he has made a reasonable good faith effort but failed. Conversely, concealment—whether affirmative concealment or the nature of the fraud—arguably should be sufficient by itself. Why should it matter whether or not a plaintiff has undertaken a diligent investigation when the concealment insures that such an exercise will be fruitless. If he cannot discover the fraud, the statute should be tolled even if he does not try.

On the other hand, the "both . . . and" approach also commends itself. Why should the statute be tolled indefinitely merely because the plaintiff, albeit exercising due diligence, happened to overlook the fraud. Before a defendant's exposure to liability is given a potentially infinite duration, there ought to be some minimum of culpability—if not affirmative concealment, then at least the construction of a scheme which is by its nature unknowable. Conversely, even if the defendant is responsible

for some measure of concealment, that alone ought not to extend the time within which plaintiff can bring his suit if the plaintiff himself has failed to undertake any reasonably diligent investigation to uncover the fraud.

The language in *Bailey, supra,* and *Detroit, supra,* refers to diligence and concealment in the conjunctive rather than the disjunctive, implying that both elements are necessary. *See also Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594, 597 (4th Cir. 1976). If both elements are necessary, then the determination that one—due diligence—is not satisfied in this case would make it unnecessary to consider whether the defendant is guilty of some concealment. However, the "either . . . or" versus "both . . . and" dispute has not been squarely considered in this Circuit. Moreover, the Seventh Circuit in *Tomera v. Galt,* 511 F.2d 504 (7th Cir. 1975), employs the "either . . . or" approach indicating that *Bailey, supra,* recognizes two kinds of fraudulent behavior to toll the statute. The first is non-discovery by the plaintiff despite due diligence even though defendant has not concealed, while the second is non-discovery because of defendant's concealment. *Id.* at 510.

Since it is at least possible that the "either . . . or" approach will be adopted in this Circuit, it is prudent to discuss why plaintiff fails to meet the concealment requirement even though I have already determined that he fails to satisfy the diligence requirement.

whether they were current, delinquent, or in foreclosure. Plaintiff also points to the listing of "Advances, as guarantors, to participants in mortgage notes" as an asset in earlier financial statements when in reality it represented delinquencies by mortgagors which Abbott had covered by making payments to the investors under its guarantee or recourse policy. Defendants' accountant admitted, under questioning by the Court, that to list such an item as an "asset" without any qualification was an "unusual" accounting practice. (Tr. 240–242).

Admittedly, these are dubious practices, but they fail to rise to the level of "affirmative concealment" of a fraud. Plaintiff points to defendant Ralph Croog's glowing optimism as late as the directors meeting of April 12, 1972, and the shareholders meeting of May 24, 1972, and juxtaposes the revelations of the "seven months report" issued less than six months later seeking to support the inference that Croog, and therefore Abbott, must have known of the impending doom but willfully concealed it from the directors, shareholders, and investors. There is no evidence, however, that Croog actually knew and affirmatively concealed this adverse financial information. Indeed, plaintiff has strenuously argued that Abbott's record keeping was so sloppy as to constitute a fraudulent practice in itself. If the records were in fact so poor, it is at least equally reasonable to infer that Ralph Croog was simply unaware of the true nature of Abbott's financial condition. In summary, I do not agree that the appearance of the "seven months report" issued in November, 1972, demonstrates affirmative concealment through June 3, 1972.

■ Plaintiff's next claim of affirmative concealment is that Abbott did not open a trustee account until October, 1972. Plaintiff alleges that the failure to maintain such an account is in violation of state statutory and common law duties. Nowhere does plaintiff claim that Abbott concealed the non-existence of such account. On the contrary, as plaintiff's brief points out, the endorsement on plaintiff's checks shows that his payments toward investments were deposited in Abbott's general account. It is difficult to see how opening the trustee account in October, 1972, constitutes affirmative concealment of fraud before June, 1972.

Plaintiff's third claim of affirmative concealment involves letters sent to most investors on November 9, 1972, and September 25, 1972, advising them that several of the large trust mortgages have slowed up in payment and that the Pusey mortgage had defaulted. There was also evidence to show that Ralph Croog directed that these letters not be sent to plaintiff. Assuming that this conduct constituted acts of affirmative concealment, it is irrelevant to the statute of limitations issued since it occurred in September and November, 1972, and therefore could not serve to toll the statute before June 3, 1972.

This same difficulty in timing precludes plaintiff's reliance on the "empty office meeting" in December, 1972. At that meeting plaintiff agreed to substitute an investment in the Padanarum Road project for his prior investment in the Greenway Inn project. The directors meeting minutes for November 29, 1972, show that Ralph Croog acknowledged in that meeting that the money deposited by investors for the Greenway Inn project had been used for other mortgages and was not available to be returned. Plaintiff claims that this misuse of the Greenway Inn money was not revealed to him in the December "empty office meeting." Again, however, even assuming this is an act of affirmative concealment, it occurred long after June 3, 1972, and therefore cannot be relied on to toll the statute before that date.

■ Finally, plaintiff claims that the practice of advancing money to investors after the default of a mortgage constituted "affirmative concealment" because it served to project an image of stability and security even though Abbott was in serious difficulty. It is difficult to see, however, how the mere practice of making advances constituted concealment. It might be so characterized if Abbott hid from investors

the fact that the payments were in reality advances rather than payments from the mortgagor. But as discussed, *supra,* a financial statement received by the plaintiff at the end of 1971 contained a line item for "advances." Although it may have been misleading to label such advances as assets, the fact of such advances certainly was not concealed. Plaintiff has failed to demonstrate that the fraud was affirmatively concealed by the defendants. He has also failed to satisfy the alternative test of showing that the fraud was of the nature which "conceals itself." *Bailey, supra,* 88 U.S. (21 Wall.) at 349–50.

The parties have not referred to, nor have I found, any case law explaining what it means for a fraud to "conceal itself." As noted above, the cases in this Circuit have phrased the standard only in terms of affirmative misconduct and thus have not had occasion to interpret the phrase "conceal itself" as used in *Bailey.* Thus some consideration must be given as to what circumstance—less than affirmative concealment—is sufficient to toll the statute.

■ The reference in *Bailey* to a fraud which "concealed itself" must mean more than simply a fraud which is unknown to the plaintiff. The very essence of a fraud requires that some aspect of the scheme is hidden. To say that the concealment requirement is satisfied whenever the plaintiff does not have actual knowledge of the fraud is merely to restate the predicate for the operation of the equitable tolling doctrine. As the Court in *Bailey* said, "the statute does not begin to run until the fraud is discovered" when the plaintiff has been diligent and the fraud has been concealed or "conceal[s] itself." 88 U.S. (21 Wall.) at 349–50. The requirement that the fraud "conceal itself" must mean more than that the plaintiff is ignorant of the deception.

A better reading of the phrase is that it encompasses an enterprise where the particular fraud is, by its nature, unknowable. A fraud "conceal[s] itself" when a plaintiff, even by the exercise of due diligence, could not uncover it. It is distinguishable from

"affirmative concealment" because that doctrine requires some conduct of the defendant directed at the objective of keeping the fraud concealed. By contrast, a fraud conceals itself when the defendant does only what is necessary to perpetrate the fraud, and that alone makes the fraud unknowable, without additional efforts at concealment. In other words, the very essence of the fraudulent practice itself prevents discovery.

■ Applying that standard to the facts of this case, it is apparent that the plaintiff falls far short of satisfying it. As noted during the discussion of facts that should have put plaintiff on notice, many items were known to the plaintiff that should have alerted him to the practices he now complains of. Plaintiff could have discovered the speculative nature of the underlying investments by viewing the property or talking to mortgagors. He could have inquired into the quality of the "guarantee" offered by Abbott and into the relationship between contingent liability and corporate equity. Plaintiff also could have found out the source of the valuations of property invested in and sought an independent appraisal. The evidence shows that plaintiff knew, or at least should have known, that Abbott was making advances to investors and a simple request to review the records of the corporation would have revealed the record keeping practice he complains of. Although these allegedly fraudulent activities may not have been affirmatively disclosed to the plaintiff, the record does not support a finding that they were incapable of being known, and that the fraud therefore "concealed itself."

■ Moreover, knowledge of all the aspects of the fraud is not an essential prerequisite to the running of the statute. The level of knowledge a plaintiff must obtain before the statute runs is relatively low. As the Second Circuit phrased it,

the time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud,

but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme. "[T]he statutory period . . . [does] not await appellant's leisurely discovery of the full details of the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).

*Arneil v. Ramsey*, 550 F.2d 774, 780 (2d Cir. 1977); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975).

I find that the plaintiff failed to exercise due diligence and that he has not demonstrated that the fraud was either affirmatively concealed or incapable of being known. Consequently, plaintiff fails to satisfy both requirements of the federal equitable tolling doctrine and his federal claims as to the first seven investments are time-barred.

The remaining issues have been dealt with in a memorandum made available to counsel.