Gail **BILICK** and Brian Bilick individually, and Gail Bilick as parent and natural guardian of Alison Bilick and Erica Bilick, Plaintiffs,

v.

**EAGLE ELECTRIC MANUFACTURING COMPANY, INC.** and Melvin Ludwig, Defendants.

No. CV–90–0880 (RJD).

United States District Court, E.D. New York.

Nov. 2, 1992.

Norman A. Senior, Greenfield Eisenberg Stein & Senior, New York City, for plaintiffs.

Jay F. Gordon, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiffs bring this securities fraud action alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Act"), Rule 10b–5 promulgated thereunder, and pendent state law claims. This suit arises out of the 1986 sale of plaintiffs' stock in Eagle Electric Manufacturing Company ("Eagle"), back to Eagle under a stock purchase agreement between the corporation and its shareholders. The sale was negotiated by defendant Melvin Ludwig ("Ludwig"), Eagle's Chairman and President, and plaintiff Gail Bilick, Ludwig's first cousin. Defendants have filed a motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to allege a cause of action under section 10(b), and pursuant to Fed.R.Civ.P. 9(b), for failure to plead fraud with particularity. Through supplemental letter briefs, defendants more recently have moved to dismiss on grounds that plaintiffs' federal securities claim is barred by the applicable statute of limitations.

As set forth more fully below, plaintiffs' federal cause of action as currently pleaded is time-barred. Defendants' motion to dismiss the amended complaint is granted, without prejudice to the plaintiffs to re-plead within sixty days of the date of this decision.

## BACKGROUND

The following summary of the facts is taken from the amended complaint and the exhibits thereto.

*The Parties*

Eagle is a closely-held, family corporation organized and existing under the laws of the State of New York. Eagle is a major manufacturer of electrical products, with annual sales in excess of $100 million. Defendant Ludwig has been the President and Chairman of the Board of Eagle since 1981, and, at all times relevant to this action, its dominant and controlling shareholder. Together with his immediate family, Ludwig owns or controls almost 39% of Eagle's issued and outstanding common and preferred shares. Amended Complaint, at ¶¶ 7–8. Throughout the relevant period, plaintiff Gail Bilick owned 432 shares of the issued and outstanding Eagle preferred stock, and 17 shares of the issued and outstanding Eagle common stock. Her children—Alison, Erica, and Brian Bilick—each owned eight shares of Eagle common stock. Overall, plaintiffs owned 1% of the Eagle issued and outstanding common stock and 2% of the Eagle issued and outstanding preferred shares. Amended Complaint, at ¶ 9.

*The Shareholders' Agreement*

In the Fall of 1971, the Eagle shareholders, including Gail Bilick, signed a Share-holders' Agreement (the "Agreement"), providing that they would not sell any of their Eagle shares to third parties without first offering to sell them back to Eagle, "at a reasonable price and not above its book value...." Agreement, at ¶ 3.[1] Notice of the shareholder's intention to sell was to be given to Eagle by registered mail and addressed to the principal office of the corporation. *Id.* If Eagle considered the offered price unreasonable, it could submit the dispute to arbitration to determine a fair and reasonable price. *Id.* at ¶ 3. New York law was to govern any dispute arising from the Agreement. *Id.* at ¶ 18.

*The Stock Sale*

On or about February 28, 1986, Rick Bilick, Gail's husband, lost his job at Price Waterhouse as a manager of manufacturer consulting services. In April of 1986, Gail Bilick telephoned Ludwig to request that Rick be employed by Eagle in a similar capacity. In a later telephone call to Ludwig, Gail Bilick explained that she and her husband were having financial difficulties, and that aside from their Eagle shares, they were without other income or assets. Ludwig offered neither employment to Rick Bilick nor any loan to the Bilick family.[2]

In early May of 1986, Gail Bilick expressed an interest in selling a portion of her shares back to Eagle, but Ludwig informed her that "she was required to sell 'all or none,'" and offered a "take it or leave it" price of $15,000 per share, stating that the book value of the shares was $25,000 per share. Amended Complaint, at ¶¶ 27–28.[3] On May 2, 1986, Gail Bilick

---

1. An exception to this requirement permits the shareholders to sell or assign shares to members of their immediate family. Agreement, at ¶ 2. The "book value" of the stock was to be determined by the certified public accountant servicing the corporation, with no allowance for good will or corporate trade name. *Id.* at ¶ 10. Accounts payable and accounts receivable were to be taken at face amounts, less discounts, the machinery and equipment assessed at their valuation on the corporate books, inventory assessed at its cost or market value, whichever was lower, and all unpaid and accrued taxes deducted as liabilities. *Id.*

2. Plaintiffs allege that according to Ludwig, Eagle always has had a policy of offering employment to family members who requested it, and of making loans to shareholders secured by their Eagle shares. Amended Complaint, at ¶¶ 22, 24.

3. In light of the terms of the Agreement these negotiations were somewhat irregular. Under the Agreement, the *seller* proposes a purchase price; if the purchaser rejects that proposal, the reasonableness of the price is submitted to arbitration. At any time the seller may elect to retain her shares.

went to the defendants' offices and signed a letter agreement offering for sale to Eagle all of the plaintiffs' common and preferred Eagle shares for a total purchase price of six hundred and fifty-eight thousand and two hundred dollars ($658,-200.00)—$15,000 for every share of common stock, and $100 for every share of preferred. All of plaintiffs' shares were delivered to Eagle that same day.

## ALLEGATIONS

Plaintiffs now allege a litany of improper acts, misrepresentations, and omissions with respect to this securities transaction and the value of the Bilick shares. Among these, plaintiffs assert that 1) they were never advised of certain purchase option arrangements between Ludwig and the corporation in place at the time of the stock sale, Amended Complaint, at ¶ 18; 2) they were never advised of various offers from other companies to purchase Eagle in or about 1985, *id.* at ¶ 19; 3) Ludwig intentionally misrepresented to Gail Bilick that she must sell "all or none" of her shares, *id.* at ¶ 34; 4) at the time of the stock sale Gail Bilick had no knowledge of the terms of the Agreement, that defendants had never provided her with a copy of it, and she had only signed the signature page of the Agreement at her mother's request, *id.* at ¶¶ 10, 26, 29;[4] 5) for fifteen years defendants had failed to provide plaintiffs with financial and other information about Eagle as required by the corporate by-laws, *id.* at ¶ 34; 6) at the time of the sale plaintiffs had no financial documentation regarding the book or other value of their shares, *id.* at ¶¶ 29–30; 7) Ludwig's representation of "book value" was based upon unaudited financial statements, and not calculated in accordance with the terms of the Agreement, *id.;* and 8) Ludwig misrepresented plaintiffs' ability to sell their Eagle shares at a price in excess of $15,000 per share. In sum, plaintiffs allege that due to

Ludwig's position at Eagle they reasonably relied solely on his misrepresentations in deciding to sell their stock, and that but for Ludwig's misrepresentations and omissions plaintiffs would not have sold their shares, or would have sold them at a higher price. *Id.* at ¶¶ 36–38.

## DISCUSSION

On a motion to dismiss a complaint, a court must construe the allegations in the complaint in the light most favorable to the plaintiffs and accept those allegations as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The Court " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof,' " *Mekhjian v. Wollin,* 782 F.Supp. 881, 884 (S.D.N.Y. 1992) (citing *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)), and generally is limited to the facts as alleged in the pleadings, and to any documents attached as exhibits or incorporated by reference. *Cosmas, supra,* 886 F.2d at 13. A complaint will be dismissed if the plaintiffs can prove no set of facts supporting their claims. *E.g., Dahlberg v. Becker,* 748 F.2d 85, 88 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).

On the instant motion, this Court must first address the statute of limitations arguments advanced by the defendants. After briefing and oral argument, defendants for the first time raised a statute of limitations issue in light of the Supreme Court's June 19, 1991, decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). *Lampf* established a uniform limitations period for federal securities actions brought under section 10(b) of the Act. Rejecting the prior federal court practice of borrowing state statute of limi-

---

In the instant case, the *purchaser* Eagle proposed the first sale price. The *seller* Gail Bilick did not exercise her rights under the Agreement to propose a purchase price, and the transaction went forward once Bilick had accepted Ludwig's offer.

**4.** Gail Bilick further contends that she never received a copy of the Agreement "until months after the Bilick Shares were sold back to Eagle Electric in 1986." *Id.* at ¶ 10.

tations for federal securities actions, *Lampf* instead adopted a single federal limitations period, permitting actions to be brought not more than one year from the date the alleged securities fraud was or reasonably should have been discovered, and, in any event, not more than three years from the date of the securities transaction in question (hereinafter the "one/three rule"). In a separate decision decided that same day, the Court essentially foreclosed the question of retroactivity of *Lampf,* see *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), holding that, "when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata." *Id.* at ——, 111 S.Ct. at 2448. Following these decisions, defendants contended that since the sale in question took place on May 2, 1986, and the plaintiffs did not commence this action until March 14, 1990, retroactive application of *Lampf* barred plaintiffs' federal securities claim.

The retroactivity of *Lampf* was short-lived, however. On December 19, 1991, Congress, through the enactment of a new section 27A of the Act, provided for the reinstatement of certain actions dismissed under *Lampf.* That amended section reads as follows:

> The limitation period for any private civil action implied under section 10(b) of this Act [the '34 Act] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. 102–242, § 476, 105 Stat. 2236 (to be codified at Securities Exchange Act of 1934, § 27A, 15 U.S.C. § 78aa–1) (1991). This amendment thus returns litigants to the pre-*Lampf* state of the law. Accordingly, the pertinent statute of limitations questions now confronting the parties are 1) what limitations period applied to plaintiffs' 10(b) claim as of June 19, 1991?; and 2) does that applicable limitations period bar plaintiffs' 10(b) claim?

As a preliminary matter, plaintiffs suggest that defendants should not be allowed to move to dismiss the complaint on statute of limitations grounds by raising this argument so long after the motion to dismiss had been fully submitted. Plaintiffs in essence suggest that where *Lampf* and the subsequent enactment of the new section 27A merely restore the pre-*Lampf* state of the law, defendants should not now be allowed to use *Lampf* as an excuse for the presentation of *other* statute of limitations arguments—to wit, that certain *state* limitations periods equally bar plaintiffs' claim—that were available at the time this action commenced and at the time this motion was first briefed and argued. Plaintiffs are understandably distressed that with the introduction of this new argument, the defendants may benefit unfairly from the lapse of time between the submission of this motion and this Court's disposition of it.

■ Without question, it is troubling that the defendants waited until so late in the game to bring these concerns to the attention of the Court. Statute of limitations defenses may be waived if not raised in a pleading at the "earliest possible moment," see *Santos v. District Council,* 619 F.2d 963, 967 n. 5 (2d Cir.1980) (citation omitted); *cf. also Litton Indus. v. Lehman Bros. Kuen Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992) (litigants may not rely on *Lampf* to excuse failure to raise statute of limitations defenses prior to appeal), and, as a general rule, if defendants had failed to raise the defense at all, this court would not be empowered to raise it *sua sponte. See Davis v. Bryan,* 810 F.2d 42, 44–45 (2d Cir.1987). However, where defendants have yet to file a responsive pleading, this Court is constrained to accept the statute of limitations argument as timely. Defendants would be free to assert this defense in their answer, see *Santos, supra,* (limitation defense raised in answer after disposition of summary judgment motion timely); *see also Kulzer v. Pittsburgh–Corning Corp.,* 942 F.2d 122, 125 (2d Cir.1991), and

this Court's refusal to consider such arguments now would only delay the necessary resolution of this issue. Concerns of judicial economy and efficiency favor prompt adjudication, and nothing of substance has transpired in this case since its commencement that would suggest the plaintiffs are prejudiced by the defendants' delay. *See Lewis v. Hermann*, 775 F.Supp. 1137, 1143 (N.D.Ill.1991) (where nothing of major substance occurred, "[t]he only prejudice to [plaintiffs] is that [they] may ultimately be denied a decision on the merits of [the] case. That alone is not the kind of prejudice that compels a finding of waiver of the limitations defense"); *cf. also Block v. First Blood Assocs.*, 763 F.Supp. 746, 748 (S.D.N.Y.1991) (plaintiff reasonably may be charged with knowledge of the limitations period applicable to complaint).

Having paused to consider these objections, the Court now proceeds to analyze the statute of limitations question.

## I. *Second Circuit Law Prior to* Lampf

Reviewing the tangled developments in the law governing this area, the Second Circuit recently has noted that in section 10(b) actions pending at the time of the decision in *Lampf*, statute of limitations questions are to be governed by "the law existing in the pertinent jurisdiction on June 19, 1991, including the law concerning both a new limitations period and the retroactivity of such a new limitations period." *Henley v. Slone*, 961 F.2d 23, 25 (2d Cir.1992). As *Henley* points out, prior to June 19, 1991, the Second Circuit already had adopted the one/three rule for section 10(b) claims, in *Ceres Partners v. GEL Assocs.*, 918 F.2d 349 (2d Cir.1990), anticipating the Supreme Court's decision in *Lampf.* Thus, the determination of the limitations period to apply to 10(b) claims in the Second Circuit at the time of the *Lampf* decision was in general dictated by the same one/three rule announced in *Lampf* itself.

Regrettably, the inquiry does not end there. This parallelism does not necessarily mean that the one/three rule is appropriately applied to the instant action. Beyond the holding of *Ceres Partners*, pre-*Lampf* principles of retroactivity also must be taken into account. *Ceres Partners* did not reach the issue of the retroactive application of the one/three rule; But, in another decision also announced prior to *Lampf*, the Circuit held that the one/three rule ordinarily would *not* be applied retroactively. *Welch v. Cadre Capital*, 923 F.2d 989 (2d Cir.1991) (rule to be applied sparingly to cases instituted prior to *Ceres Partners*) ("*Welch I*"), *vacated and remanded sub nom. Northwest Sav. Bank v. Welch*, —— U.S. ——, 111 S.Ct. 2882, 115 L.Ed.2d 1048 *aff'd*, 946 F.2d 185 (2d Cir.1991) ("*Welch II*"); *see also Henley, supra*, 961 F.2d at 25–26.[5] *Welch I* outlined the very limited circumstances under which the one/three rule may be afforded retroactive effect. Specifically, the Circuit looked to the three-part test articulated in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971):

> [A] decision 'must establish a new principle of law, either by overruling clear past precedent on which the litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed.' *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. A court should then 'weigh' in each case whether retroactive application would conflict with the purposes of the rule and whether it would produce inequitable results. *Id.* at 106–07, 92 S.Ct. at 355–56.

*Welch I, supra*, 923 F.2d at 993 (footnotes omitted). If all three of these factors are met—that the decision establishes a new rule of law, that retroactive application will conflict with the purposes of the new rule, and that the equities involved do not favor retroactivity—the new rule will be applied prospectively only.[6] Thus, in cases where

---

**5.** The decision in *Ceres Partners* was announced on November 8, 1990, several months after the filing of this action.

**6.** Applying this test, the court in *Welch I* held that the one/three rule would *not* apply retroactively to the case before it.

the one/three rule of *Ceres Partners* does not apply retroactively, the applicable limitations period is instead determined by reference to the pertinent limitations periods and borrowing rules of the forum state. *See Ceres Partners, supra,* 918 F.2d at 353 (citing cases).

In *Henley, supra,* the Circuit attempted further to clarify the scope of this retroactivity analysis. Despite the language in *Welch I* clearly discouraging retroactive application of the one/three period as a general rule, *Henley* nonetheless emphasized the individualized nature of the inquiry. *Henley* reinforced the view that courts must proceed instead on a case-by-case basis, and in particular must examine "whether the retroactivity principles applied in *Welch I* make it inappropriate to apply the new limitations period." *Henley, supra,* 961 F.2d at 25. Practically speaking, a court must examine principally the third *Chevron/Welch I* factor—whether reliance on a federal or state limitations period best assures an equitable outcome—to determine retroactivity, see *Grondahl v. Merritt & Harris, Inc.,* 964 F.2d 1290, 1293 (2d Cir.1992), since the first two factors of the test ordinarily will favor prospective application only.

Applying the three-pronged *Chevron/Welch I* test to the facts here, with respect to the first factor—the novelty of the rule announced—it is unquestionable that *Ceres Partners* established a "new principle of law" that plaintiffs could not easily have predicted. *See Welch I, supra,* 923 F.2d at 994 (one/three rule "was not so clearly foreshadowed that plaintiffs were chargeable with its prediction"). The second factor—whether retroactive application in this instance is at odds with the purpose of the rule—equally discourages retroactivity; application of a new rule designed to serve the interests primarily of private, individual litigants, rather than institutional interests, cannot reasonably be said to further the purpose of a rule not yet known to the individual, private parties at the time the action was commenced. *Id.* at 994–95. Permitting litigants to rely upon the prior limitations period better preserves plaintiffs' interests in receiving notice of their right to sue and the defendants' interest in having notice of their potential liability. *Id.*

■ The third and last factor—the equities involved—involves a somewhat trickier examination. For the reasons set forth *infra,* at Section II, defendants correctly argue that the two-year limitations period under Connecticut law must apply to this case. Plaintiffs' federal cause of action accrued in Connecticut where the plaintiffs resided at all relevant times. To be precise, plaintiffs' 10(b) claim accrued on May 2, 1986, the date of the Letter Agreement to purchase the Bilick stock, and the date on which Gail Bilick actually conveyed the shares back to Eagle. As the Second Circuit clearly stated in *Grondahl, supra,* 964 F.2d at 1294, "statute of limitations in federal securities law cases starts to run on the date that the parties have *committed* themselves to complete the purchase or sale transaction" (emphasis in original) (citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972)). The parties here were "committed" to the transaction upon the signing of the Letter Agreement, and were not obligated to go through with the transaction before that point. *See Radiation Dynamics, supra,* at 891 (commitment "marks the point at which the parties obligated themselves to perform what they had agreed to perform").

■ At first blush, this reliance on Connecticut's two-year rule would appear to moot any consideration of the equitable concerns underlying *Welch I* and the cases following it: plaintiffs brought this action on March 14, 1990, more than three years after the date of the stock sale, and therefore, under either the two-year state period or the strict three-year federal limitation, plaintiffs' 10(b) claim would be time-barred. However, unlike the one/three rule that imposes an absolute time limit on the bringing of these claims, e.g., *Mekhjian, supra,* 782 F.Supp. at 885–86; *Farley v. Baird, Patrick & Co.,* 750 F.Supp. 1209, 1214 (S.D.N.Y.1990), the two-year Connecticut limitations period may be tolled if plaintiffs

adequately have alleged some fraudulent concealment precluding discovery of the underlying securities fraud. If plaintiffs can show that the alleged fraud was not or could not reasonably have been discovered prior to March 14, 1988—two years before the filing of this action—the Connecticut rule clearly would afford plaintiffs a more generous limitation period than *Ceres Partners,* and a balancing of the equities would therefore suggest that retroactive application of the one/three rule would not be appropriate.

## II. *Applicable Statute of Limitations*

Plaintiffs note that New York law governs any sale or purchase of Eagle stock under the Shareholders' Agreement. Agreement, at ¶ 18. They therefore claim the New York statute of limitations should apply in this case. In actions for section 10(b) claims brought in New York, the New York limitations period for actions based on common law fraud often is applied. *Armstrong v. McAlpin,* 699 F.2d 79, 86 (2d Cir.1983). Under that provision, plaintiffs must sue within six years from the time the cause of action accrued or within two years from the time the wrongdoing was, or with reasonable diligence should have been discovered. N.Y.Civ.Prac.L. & R. §§ 203(f) & 213(8) (McKinney 1990).

 Plaintiffs are correct to point out that New York *law* governs, but it simply does not follow that plaintiffs therefore may take advantage of New York's more generous six-year period. Application of New York law includes those laws directing courts of the forum state to borrow the statute of limitations of another jurisdiction, see *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977), and pursuant to New York's borrowing rule, the pertinent limitations period is that of the state in which the cause of action *accrues.* The New York borrowing statute provides that a "cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued ..." N.Y.Civ. Prac.L. & R. § 202 (McKinney 1990). Ac-

cordingly, precisely because the Agreement expressly provides for New York law to govern here, New York's borrowing rules must be followed: if the cause of action accrued outside of New York, the limitations period from the accrual jurisdiction—not from New York—will apply. *See Klock v. Lehman Bros., Kuhn Loeb Inc.,* 584 F.Supp. 210, 215 (S.D.N.Y.1984) (citing cases).

 Absent unusual circumstances, a 10(b) claim accrues where the plaintiffs has suffered the alleged injury, see *Stafford v. International Harvester Co.,* 668 F.2d 142, 148–50 (2d Cir.1981); *see also Miller v. Grigoli,* 712 F.Supp. 1087, 1090 (S.D.N.Y. 1989), and, in securities fraud cases, the place of injury is "where 'its economic impact is felt, normally the plaintiff's residence.'" *Ceres Partners, supra,* 918 F.2d at 353 (citations omitted); *see also Klock, supra,* 584 F.Supp. at 215 ("To the extent plaintiff becomes a poorer man, he became a poorer Connecticut resident"); *Maiden v. Biehl,* 582 F.Supp. 1209, 1217 (S.D.N.Y. 1984) (residence test shorthand method to decide where economic impact is felt). The "place of injury" test is used even though New York courts have adopted a more particularistic "grouping of contacts" test to various other conflict of laws questions. *See Gorlin, infra,* at 240; *see also Bache Halsey Stuart Inc. v. Namm,* 446 F.Supp. 692, 696–97 (S.D.N.Y.1978).

 In this case, plaintiffs' residency in Connecticut is not disputed. All plaintiffs resided in Connecticut at the time of the transaction in question and at the time of the filing of this action. Amended Complaint, at ¶ 3. The "economic impact" of plaintiffs' alleged loss was felt in Connecticut, and in fact plaintiffs have alleged no special circumstances requiring a deviation from the general rule that their cause of action accrued in their state of residence. *Compare Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421, 1424–27 (S.D.N.Y.1984) (securities fraud action accrued in Massachusetts for Canadian citizen who maintained financial base in Massachusetts and whose losses stemmed from funds kept there). The applicable limita-

tions period for a section 10(b) action accruing in Connecticut generally has been held to be two years after the contract of sale for securities. *See* Conn.Gen.Stat. § 36–498(f) (1992); *Welch I, supra,* 923 F.2d at 993; *see also Clute v. Davenport Co.,* 584 F.Supp. 1562, 1577 (D.Conn.1984); *Maiden, supra,* 582 F.Supp. at 1214. Therefore, pursuant to New York's section 202, this shorter two-year period, and not New York's own six-year period, applies to plaintiffs' action here.[7]

Plaintiffs nevertheless contend that the Connecticut statute of limitations should not apply here—at least as to the corporate defendant—because Eagle is a New York corporation not amenable to suit in Connecticut, citing *Stafford v. International Harvester Co., supra. Stafford,* a diversity action, involved the application of New York's borrowing statute to determine whether "a cause of action can accrue for borrowing purposes in a jurisdiction where the defendant is not amenable to suit." *Id.* 668 F.2d at 151. In *Stafford,* the district court held that where plaintiff was a Pennsylvania resident bringing an action in New York, the Pennsylvania limitations period would apply to his suit against two corporate defendants, a New York corporation and a Delaware corporation. The Circuit reversed. Observing that the fundamental purpose underlying the New York borrowing provision is "to prevent forum shopping by plaintiffs who may be barred by the limitations period of one possible forum but not that of another," *id.,* the Circuit reasoned that this forum-shopping rationale served no purpose where a corporate defendant could not be sued in the state of plaintiff's residence. *Id.* at 150 ("The result of holding that Pennsylvania's limitation period applies under the borrowing statute is to bar [plaintiff's] action against [defendant] despite the fact that all the parties concede that [the defendant] has never had sufficient contact with Pennsylvania to permit it to be sued in that state."). Accordingly, *Stafford* held that a

defendant is not entitled to the protection of the borrowing statute if it is not subject to personal jurisdiction in the state in which the cause of action accrued. *Id.* at 152. Relying on *Stafford,* plaintiffs argue that New York's six-year limitations period should apply to this action since a Connecticut court cannot exercise its jurisdiction over the corporate defendant Eagle.

Whether or not plaintiffs' assertions as to a Connecticut court's jurisdiction over Eagle are true, their reliance on *Stafford* is misplaced. In a diversity case like *Stafford,* where the federal court sits as a court of the forum state, the fact that a Connecticut court might not have had personal jurisdiction over the corporate defendant implicates concerns that in a federal securities action simply do not exist. *See Morin v. Trupin,* 799 F.Supp. 342, 347 n. 7 (S.D.N.Y.1992). Plaintiffs overlook the significance of this distinction; unlike a diversity action, with regard to plaintiffs' federal securities claim the defendants are subject to nationwide service of process. *See Mariash v. Morrill,* 496 F.2d 1138, 1142 (2d Cir.1974); *see also Gorlin, supra,* 706 F.Supp. at 240; *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 634 F.Supp. 1341, 1345 (S.D.N.Y. 1986). Moreover, pre-*Ceres Partners* precedents strictly adhered to the view that in federal securities cases, the cause of action would accrue at the location where the loss took place, without mentioning or referring to *Stafford. E.g., Morin, supra,* 799 F.Supp. at 347 n. 7 (citing *Armstrong, supra,* 699 F.2d at 89). The *Stafford* argument is without foundation, and does not alter the result here: following New York's borrowing rules as outlined in CPLR section 202, the Connecticut statute is the proper limitations period to use. At the time of the filing of the instant action, Connecticut's two-year statute of limitations was applicable to plaintiffs' federal securities claim, and, despite the legal quagmire spawned by *Lampf* and the flur-

---

7. Moreover, the language of section 202 indicates that between the limitations period of the forum state and period of the state where the cause of action accrued—if those are different—

the *shorter* of the two periods should apply. *E.g., Gorlin v. Bond Richman & Co.,* 706 F.Supp. 236, 239 (S.D.N.Y.1989).

ry of judicial and legislative activity that followed, Connecticut's two-year statute is the appropriate state limitations period to apply.

Since, as noted above, plaintiffs failed to bring this action within two years from the date the cause of action accrued, the only remaining question is whether the doctrine of fraudulent concealment provides the plaintiffs with the means to avoid a statute of limitations bar. Only through use of the Connecticut period, and through adequate and particularized allegations of fraudulent concealment, will plaintiffs' 10(b) claims survive at all. Under the absolute time limits of the *Ceres Partners* one/three rule, plaintiffs' 10(b) claim is clearly time-barred; applying the one/three rule to dismiss plaintiffs' federal claim would constitute just the sort of "inequitable results" that should be avoided, and thus counsels against retroactive application of *Ceres Partners. See Grondahl, supra,* 964 F.2d at 1292–93. Depriving the plaintiffs' of their day in court at this late date would hardly seem just, particularly where there is no evidence or suggestion that any delay on the plaintiffs' part may have been "the result of procedural maneuvering designed to achieve a tactical advantage." *Welch I, supra,* 923 F.2d at 995. This Court will therefore consider whether the plaintiffs' amended complaint adequately alleges facts supporting a claim of fraudulent concealment sufficient to toll the running of the Connecticut statute, and, if not, whether plaintiffs should be granted leave to replead their claim.

### III. *Fraudulent Concealment*

 In a federal securities action, any question as to when a state limitations period begins to run is determined by reference to federal law. *See Armstrong, supra,* 699 F.2d at 86–87; *Gorlin, supra,* 706 F.Supp. at 241–42. Under the doctrine of equitable tolling, the statute of limitations begins to run "when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Stull v. Bayard,* 561 F.2d 429, 432 (2d Cir.1977), *cert. denied,* 434

U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978) (citations omitted); *see also ITT, An International Inv. Trust v. Cornfeld,* 619 F.2d 909, 929 (2d Cir.1980); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975). Plaintiffs bear the burden of pleading and proving wrongful concealment, failure to uncover the operative facts underlying the fraud within the limitations period, and diligent efforts to discover the alleged fraud. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 460 (2d Cir.1974) (citations omitted); *see also Dymm v. Cahill,* 730 F.Supp. 1245, 1255 (S.D.N.Y.1990). Recently, the Second Circuit has further clarified the concealment requirement, stating that "the plaintiff may prove the concealment element by showing *either* that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir.) (emphasis added), *cert. denied,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). With respect to the diligence requirement, the standard for whether a plaintiff through reasonable diligence should have discovered sufficient facts to be on notice of the alleged fraud is an objective one. *E.g., Cruden v. Bank of New York,* 957 F.2d 961, 973 (2d Cir.1992). The Court must determine whether, based upon the facts readily available at the time, a "reasonable investor" would have been on notice that further investigation was necessary. As stated in *Armstrong, supra,*

"[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he had been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."

*Id.* at 88 (quoting *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6 (1895)). *See also Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 663 (S.D.N.Y.1987);

*Long v. Abbott Mortgage Corp.,* 459 F.Supp. 108, 116–17 (D.Conn.1978). Plaintiffs need not know every particular of the fraud alleged to be on notice; it is enough that they have an awareness of the "general fraudulent scheme." *See Arneil, supra,* 550 F.2d at 780; 748 F.Supp. 146, 158 (S.D.N.Y.1990); *Maiden v. Biehl, supra,* 582 F.Supp. at 1214. The applicable statute of limitations does not "await [a plaintiff's] leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). Certainly, a plaintiff is not under a duty of inquiry until some "storm warnings" have issued suggesting *further investigations is* warranted, yet plaintiffs "need only have known of the *possibility* of fraud, not of the actual nature of the alleged fraud" for purposes of this discovery rule. *Bresson v. Thomson McKinnon Securities, Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986) (emphasis added).[8]

 Even a cursory review of the amended complaint exposes plaintiffs' failure to plead the sort of fraudulent concealment necessary to survive this motion to dismiss. At the most basic level, plaintiffs have neglected to allege the specific time and circumstances of the discovery of any concealment from which this Court could determine the timeliness of plaintiffs' federal claim. In fact, the current allegations suggest that at the very least, plaintiffs may have had, or are chargeable with, sufficient facts prior to the stock transaction to place them on inquiry notice of a potential claim. To the extent the plaintiffs' claims revolve around defendants' alleged violations of the Agreement, either by failing to follow the stock repurchase procedures outlined therein, or by failing to calculate the "book value" of the Eagle shares consistent with the manner prescribed by the Agreement, plaintiffs' contention that Gail Bilick, as the signatory, never saw or read the Agreement before she signed it at her mother's request, simply is insufficient to show that plaintiffs' were not on notice as to the terms of the Agreement, and thus on notice that defendant Ludwig's conduct in connection with the stock repurchase did not strictly follow the procedures outlined therein.[9] These assertions, if true, hardly demonstrate that Gail Bilick should not be charged with knowledge of the terms of the Agreement she recalls signing, nor do they demonstrate that she could not have through reasonable efforts reviewed or assessed its terms at the time of the stock repurchase to ascertain whether defendant Ludwig's proposals to them were consistent with their rights under the Agreement. *See Lang, supra,* at 1427–28 (investor who received confirmation slips and monthly statements detailing facts of trades on his account on notice of occurrence of allegedly unauthorized trades, whether or not he actually read those confirmations and

---

**8.** Decisions of this Circuit sometimes have differed as to whether both the elements of "diligence" and "concealment" are required to prevent the running of a limitations period. A handful of cases have suggested that where there has been "active concealment" of the sort that no amount of diligence will uncover, requiring the plaintiff to prove reasonable efforts to uncover the fraud is unnecessary. *E.g., Baskin v. Hawley,* 807 F.2d 1120, 1130–31 (2d Cir. 1986); *Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979); *see also Long, supra,* at 117–18 & n. 7 (reviewing case law). However, a long series of decisions agree that a plaintiff must always show that she acted reasonably to uncover the fraud, see, e.g., *Stone v. Williams,* 970 F.2d 1043, 1048–49 (2d Cir.1992) ("[f]raudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a reasonably diligent plaintiff would or could have known regarding the claim"); *see also Bowers v. Transportacion Maritima Mexica-*

*na, S.A.,* 901 F.2d 258, 264 (2d Cir.1990); *Detroit, supra,* at 461, and the Court sees no reason to depart from the reasoning in those cases. Even if that there has been some affirmative concealment on the part of a defendant, that circumstance, standing alone, should not toll the limitations period where the plaintiff has failed completely to undertake any investigation to expose the fraud.

**9.** As to Gail Bilick's knowledge on this point, the amended complaint states only the following:

> Although Gail signed the signature pages of the Agreement at her mother's request, she did not have a copy of the Agreement at that time and was never given one until months after the Bilick Shares were sold back to Eagle Electric in 1986. Defendants never provided her with a copy of the Agreement.

Amended Complaint, at ¶ 10.

statements). Where even a brief examination of the Agreement would have revealed certain procedural irregularities as to the negotiations of the stock sale, plaintiffs' claims that they were duped by Ludwig's assurances because Gail Bilick did not have a copy of the Agreement in front of her at the time of the sale loses its force. Certainly there is no allegation that Gail Bilick was not aware of the existence of the Agreement, or that she was prevented from obtaining a copy of it for herself.

Similarly, plaintiffs' allegations that for fifteen years defendants had failed to provide plaintiffs with financial and other information about Eagle as required by the corporate by-laws, or that at the time of the stock sale plaintiffs had no financial documentation regarding the book value of the Eagle shares, further suggest circumstances invoking some reasonable duty of inquiry on the plaintiffs' part to investigate the financial condition of Eagle before finalizing the securities transaction here. Yet notwithstanding the issuance of these "storm warnings," plaintiffs do not allege that they attempted to obtain financial or other information regarding the value of the shares. Indeed, there is no statement in the amended complaint that the plaintiffs took *any* steps to ascertain either their rights under the Agreement or the accuracy of the stock valuation. *See, Miller, supra*, at 1091–93 (where plaintiff discovered misstatements and omissions in financial statements received from partnership, but chose to make no inquiries or take further action, and in fact invested further in partnership, plaintiff could be deemed to be on "inquiry notice" due to failure to exercise reasonable diligence under circumstances). Plaintiffs appear indirectly to allege that they undertook no further investigation due to Ludwig's position as a control person at Eagle, asserting, "[a]s a consequence of defendant Ludwig's position as the president, chairman of Eagle Electric's board, and its dominant and controlling shareholder, and as a member of plaintiffs' family, plaintiffs justifiably and reasonably relied on the misrepresentation made to him by them." Amended Complaint, at ¶ 36. Yet clearly this fact by itself does not obviate the need for plaintiffs to plead diligent efforts to uncover an alleged fraud once they were on notice of the various problems outlined above. Although the amended complaint alleges that defendant Ludwig has remained the dominant and controlling shareholder at least until the institution of this action—and thus during the time of whatever discovery plaintiffs made that led them to bring this action—his position alone does not relieve the plaintiffs of their duty to undertake reasonably diligent efforts to uncover the alleged underlying fraud, and to particularize those efforts in their pleading. *See supra* note 9 (discussing need for diligence requirement even in cases where fraud is actively concealed); *see also Long, supra*, at 114–18 (investor in mortgages who had knowledge of risk of investments and early default of mortgages but undertook no independent investigation of them had not satisfied his duty to undertake diligent efforts to uncover alleged fraud once he was put on notice of potential problems; moreover, in light of representations that investor relied exclusively on the valuation of the mortgaged properties to protect investment, investor was on notice of need to investigate land values but failed to undertake an independent valuation assessment). Fraudulent concealment, like any other sort of fraud, must be pleaded with particularity, and the plaintiffs must offer "distinct averments as to the time when the mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made." *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir.) (Friendly, J.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). If mere conclusory allegations that a plaintiff was unable to discover the fraud before the limitations period has run are insufficient to toll the applicable statute of limitations, see *Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608, 618 (S.D.N.Y. 1990), surely the plaintiffs' wholesale failure to plead fraudulent concealment and to detail the circumstances and timing of any

discovery is fatal to their federal securities claim. For example, even if the plaintiffs have made a passing attempt to argue that the limitations period should be tolled as a result of fraudulent concealment, their non-specific assertion that Gail Bilick received a copy of the Agreement "months" after the stock sale hardly permits this Court to determine if this action is timely brought. Likewise, the amended complaint alleges that prior to the stock purchase plaintiffs were unaware of offers to purchase Eagle from other companies in or about 1985, see Amended Complaint, at ¶ 19, yet the amended complaint in no way explains either the circumstances through which the plaintiffs learned of these alleged offers, or when that discovery took place. *Compare Pomeroy v. Schlegel Corp.*, 780 F.Supp. 980 (W.D.N.Y.1991) (former employee plaintiff who sold stock back to company prior to corporate disclosure of merger intentions time-barred from filing federal securities action when plaintiff discovered the merger possibility, and investigated the potential strength of his legal claims, but did not act to file suit thereafter until applicable limitations period had run). As a further example, the amended complaint alleges that attempts by a prior employee and minority shareholder to inspect the financial statements and books and records of the company in 1985 and early 1986 were rebuffed, and that this employee then sued Eagle in 1986. Amended Complaint, at ¶¶ 20–21.[10] Again, however, the amended complaint does not describe either the exact timetable of these events or plaintiffs' discovery of them. *See Pomeroy, supra,* at 983–84 (plaintiff clearly put on notice of potential material omissions with regard to his sale of stock back to company where, among other things, he had read at least one newspaper account of suit filed in federal court arising out of same operative facts).

While the Court must construe plaintiffs' allegations liberally, at present plaintiffs have failed to plead fraudulent concealment, and the Court cannot simply turn a blind eye to an utterly deficient pleading. On the facts as alleged in this amended complaint plaintiffs may not rely upon equitable tolling principles to hurdle any statute of limitations bar. Plaintiffs' claims are time-barred, and the amended complaint must be dismissed as to plaintiffs' federal cause of action.[11]

## IV. *Leave to Replead*

Under Federal Rule of Civil Procedure 15(a), leave to replead "shall be freely granted when justice so requires," and there is no reason to deny plaintiffs that opportunity here. Upon granting a motion to dismiss it is the usual practice also to grant plaintiffs leave to replead; a court's refusal to do so without a justifying reason is an abuse of discretion. *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). Nor should this Court deny plaintiffs leave to amend by reason of delay alone:

> Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party. Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.

*State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981) (citation omitted). The doctrine of equitable tolling did not come into play until the defendants raised the statute of limitations defense, see *Long, supra,* at 113, and the plaintiffs must be allowed to respond appropriately.

---

**10.** Plaintiffs go on to explain that this litigation was concluded by settlement, pursuant to which the employee agreed not to disclose any financial information about Eagle to anyone else. Amended Complaint, at ¶ 21.

**11.** The Court notes as well that unless and until plaintiffs are able to allege fraudulent conceal-

ment sufficient to toll the running of the Connecticut statue, the question of the retroactivity of the one/three rule is essentially mooted, since as currently pleaded, plaintiffs' claims are time-barred *under either the federal or state rule.*

Accordingly, defendants' other arguments in support of their motion to dismiss—that plaintiffs have failed to state a claim upon which relief may be granted, and that plaintiffs have failed to plead fraud with particularity—need not be addressed at this juncture. If plaintiffs' second amended complaint adequately overcomes the statute of limitations bar, motions to dismiss on these alternative grounds may be resubmitted.

## V. Pendent State Claims

■ Since no federal claim remains, plaintiffs' pendent state law claims also must be dismissed. *See Grondahl, supra,* at 1294 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)); *see also Nolan v. Meyer,* 520 F.2d 1276, 1280 (2d Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975). However, plaintiffs argue that even if this Court declines to exercise its jurisdiction over the pendent state claims, federal jurisdiction nonetheless arises on the basis of the diversity of citizenship, and urge this Court to "deem" diversity jurisdiction to be alleged in the amended complaint, based upon the plaintiffs' residency in Connecticut and the defendants' operations and residency in New York. This request is appropriately construed as a motion to amend the complaint, and as such the motion is granted. Plaintiffs shall be allowed to replead to establish federal diversity jurisdiction.

## CONCLUSION

In sum, plaintiffs' amended complaint does not adequately allege facts sufficient to sustain a claim of fraudulent concealment, and defendant's motion to dismiss is therefore granted. The amended complaint is dismissed without prejudice, and the plaintiffs are granted leave to replead in accordance with this opinion. Plaintiffs shall have sixty days from the date of this decision to file a second amended complaint.

SO ORDERED.