For the foregoing reasons we affirm the judgment of conviction on all counts.

William **FRESCHI**, Jr., as Trustee of William Freschi Trust, Plaintiff-Appellee, Cross-Appellant,

v.

**GRAND COAL VENTURE**, Bandler & Kass, Ground Production Corporation, William J. Werner, Jack Mitnick, Robert Sylvor, William C. Sherr, Mineral Resources Development, Inc. and H. Jean Baker, Defendants,

Grand Coal Venture, Bandler & Kass, Ground Production Corporation, William J. Werner, Jack Mitnick, Robert Sylvor, H. Jean Baker and William Sherr, Defendants-Appellants, Cross-Appellees.

Nos. 487, 509 and 611, Dockets 84–7726, 84–7740 and 84–7764.

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1985.

Decided July 5, 1985.

Neil Schwarzfeld, New York City (Alan C. Fried, Schwarzfeld, Ganfer, Shore & Rosenblum, New York City, on brief), for defendants-appellants, cross-appellees.

Robert C. Gerrard, Boston, Mass. (Edward N. Perry, Bowker, Elmes, Perkins, Mecsas & Gerrard, Boston, Mass., on brief), for plaintiff-appellee, cross-appellant.

Before MANSFIELD, NEWMAN and PECK *, Circuit Judges.

JOHN W. PECK, Circuit Judge:

This is a securities fraud case. Following a jury trial, defendants Ground Production Corporation, Bandler & Kass, William J. Werner, Robert Sylvor, William C. Sherr, H. Jean Baker, and Jack Mitnick, appellants herein,[1] were found liable for violation of Securities and Exchange Commission Rule 10b–5, and all defendants except Sherr were found liable for common law fraud as well. They were ordered to pay plaintiff-appellee William Freschi, Jr., trustee of the William Freschi trust, $266,500 in damages, plus $126,681.75 in pre-judgment interest. *Freschi v. Grand Coal Venture*, 588 F.Supp. 1257 (S.D.N.Y.1984). Defendants have appealed, and Freschi has cross-appealed. We affirm the trial court's judgment of liability as to all defendants except Mitnick; the judgment against him

is reversed as to Rule 10b–5 but affirmed as to fraud. We also partially reverse the award of damages on the basis of our decision in *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935 (2d Cir.1984), which had not yet been decided when judgment was entered by the district court.

I.

A.

The events leading to this trial began in the summer of 1977, when William Freschi, Sr., the father of plaintiff-appellant, decided to seek a tax shelter for $2,700,000 he had realized from the sale of his interest in a business. Accordingly, he established a trust with his son, William Freschi, Jr. ("Freschi"), as trustee. Freschi decided to invest the trust corpus, which consisted principally of the funds realized from the sale of the business, in operations paying a moderate to high rate of return while offering substantial tax benefits.

A securities salesman suggested that Freschi invest in Spruce Productions, Inc., a venture being organized by appellants Werner, Sylvor, and Sherr. Werner, Sylvor, and Sherr were partners in a law firm, Bandler & Kass, which represented an entrepreneur, Joseph Laird, who was under investigation by the Securities and Exchange Commission ("SEC") for marketing of fraudulent coal leases. Knowing that the SEC "wanted to put Laird out of business," the three partners decided to take Laird's place in marketing the leases if Laird were forced to cease marketing them. The partners began doing so, through an entity called Spruce Productions, Inc., at least as early as December 1, 1977. The Spruce Productions prospectus contained an express warranty that, if the leased property did not contain recoverable coal reserves, the sponsors of the offering would provide substitute property that did contain such reserves. In the prospectus,

---

* Of the Sixth Circuit Court of Appeals, sitting by designation.

1. The briefs list Grand Coal Venture as a defendant-appellant. Grand Coal Venture, an un-incorporated entity, was named as a defendant; there was, however, no finding of liability against it, and it is therefore not a party to the appeal.

the sponsors also promised to buy at least 25% of the coal mined at a profit to the investor and to provide free legal representation to investors in the event that IRS disallowed projected tax deductions. On December 8, 1977, with the mutual consent of the SEC, Laird, and other parties not involved in this suit, the United States District Court for the Central District of California issued a temporary restraining order. The order barred Laird and certain other parties, including his attorneys, from marketing unregistered coal leases to the public. *Securities and Exchange Commission v. Cal-Am Corp.*, No. 77–4586 (C.D.Cal. Dec. 8, 1977) (T.R.O.) Werner was personally served with a copy of the order on December 14, 1977.

At this time, Freschi had already decided to invest in Spruce Productions.[2] Werner, Sylvor, and Sherr were aware of the difficulty in accepting his investment without violating the T.R.O., but wished to find a way around the problem. As a result, they decided to scrap Spruce Productions and to replace it with another entity offering substantially the same leases through dummy corporations, thus avoiding the T.R.O.'s bar on sales to the public. Werner thus informed Freschi, in a December 15, 1977 telephone conversation, that the Spruce Productions offering was being withdrawn, but would be replaced by a very similar offering. The reason for the change, Werner told Freschi, was that he had just met with IRS officials and it had proved necessary to revise the offering to conform with new IRS regulations. No such meeting with IRS officials, in fact, had occurred.

Werner, Sylvor, and Sherr then formed a company known as Ground Production Corporation. Ground Production procured Laird's coal leases from a new company called Tristar Coal Corporation, which we conclude Laird had formed in an attempt to circumvent the T.R.O. Werner, Sylvor,

and Sherr also formed an unincorporated organization known as Grand Coal Venture, which in turn obtained coal leaseholds from Ground Production. To assist them in their work, Werner, Sylvor and Sherr hired H. Jean Baker, a self-styled "geologist" without formal training in geology. Baker, a former associate of Laird's, signed a report stating that there was a strong likelihood that the leased lands contained large coal reserves.

Freschi, relying on the previous assurances that the Grand Coal Venture offering was essentially the same as the earlier Spruce Productions offering, took steps to invest in Grand Coal Venture. At this point, no one had told Freschi of Laird's difficulties with the SEC or of the temporary restraining order; Freschi's assumption was that Werner had truthfully told him the deal was being restructured due to tax problems. Freschi took independent action to verify the soundness of the projected investment. He consulted an accountant, had the trust's attorney call Werner to discuss the deal and its tax consequences, and retained an agent to verify that Bandler & Kass was a reputable law firm. This agent was satisfied by his investigation, and acting on behalf of Freschi, tendered a check for $130,000 of the trust's funds to Bandler & Kass as the first installment of payments to Grand Coal Venture which eventually were to total $266,500. This first payment was made on December 21, 1977; the documents evidencing the trust's investment were dated December 29, 1977.

Freschi did not receive Grand Coal Venture's offering memorandum until March 31, 1978. This memorandum revealed that, in spite of Werner's earlier assurances about the similarity between the Grand Coal Venture offering and the Spruce Productions one, there were some rather significant differences. Most significantly,

---

**2.** Freschi wrote a check for $130,000 made out to "Bandler & Kass, Special Account" on December 12, 1977. With it he enclosed a handwritten signed note to "Mr. Werner," stating that the check was "to sub lease [sic] coal land and to obtain an advance royalty payment writeoff

[sic]." Freschi held the check, however, until December 19; at this time he mailed it to an agent in New York, who tendered the check to Bandler & Kass under circumstances detailed below.

the Grand Coal Venture offering lacked the assurances the earlier offering had contained about the profitability of the venture, and indeed contained specific caveats as to the riskiness of the investment. The memorandum, which was a long and complex document (totalling 167 pages), also contained what appeared to be substantial similarities to the Spruce Productions offering: it dealt with coal leases in the same general region, it contained figures at the outset purporting to set forth the "total minimum" return on the investment, and, most importantly, to Freschi, it offered the same tax advantages as had the original offering. The memorandum also incorporated Baker's optimistic "geologist's report."

Upon receiving the memorandum, Freschi began a further investigation designed to insure that his investment was a viable one. His investigation included consultations with his accountant, his attorney, Sherr, a coal mining executive, an attorney specializing in coal leases, and a geologist, who accompanied Freschi to a meeting with Baker. The investigation took place over a period of three months and involved trips from Freschi's home in San Francisco to New York and Denver as well as communications by telephone and mail. Nothing in this rather thorough investigation suggested to Freschi that he was the victim of fraud.

In August, 1978, Jack Mitnick, who acted as "Venture Administrator" for Grand Coal Venture, sent investors a letter, drafted by Sylvor, stating that the leased land did not contain commercially recoverable quantities of coal. The letter further stated, however, that Grand Coal Venture's sublease from Ground Production contained an express warranty that Ground Production would, under such circumstances, give Grand Coal Venture replacement leases containing commercially recoverable coal reserves—a statement which was not true. "Accordingly," the letter continued, "demand has been made of Ground that it immediately furnish you with suitable subleases ... containing economically recover-

able coal reserves..." Ground Production actually did give Grand Coal Venture a replacement lease, similarly worthless, in December 1978. Mitnick and Werner continued to assure Freschi that all was well at regular intervals through December 1980. The trust, however, never received any profits on its investment. Finally, Freschi, his patience exhausted, filed the instant suit on July 13, 1981, in the United States District Court for the Southern District of New York.

**B.**

Freschi was, as we have noted, interested in Grand Coal Venture largely as a tax shelter. At the time of his investment, the tax laws offered large deductions for coal mining investments, as part of a national policy of developing American energy self-sufficiency.

Because Freschi's father was the sole beneficiary of the trust, the trust was not a separate taxpaying entity; all taxes on trust income were assessed directly against the senior Freschi, but paid from the trust corpus. Freschi's father claimed tax deductions for Grand Coal Venture of $520,000 in both 1977 and 1978. These deductions reduced his tax bill for the two years by $337,033.66 and $322,813.01, respectively. IRS ultimately disallowed these deductions and assessed a deficiency against the senior Freschi. It also assessed an interest penalty of approximately $264,500. IRS eventually allowed the senior Freschi, however, to claim a deduction for 1977 for his $266,500 lost investment. This deduction resulted in total federal and state tax savings for the elder Freschi of $188,682. Thus Freschi's actual out-of-pocket loss on his investment was $77,818; because of the failure of his tax shelter he was required to pay IRS $659,846.67 on account of the disallowed deductions, plus the $264,500 interest penalty.

**C.**

Freschi's suit against Grand Coal Venture and its various principals and agents

was tried before a jury in May 1984.[3] The jury returned a special verdict form finding all defendants liable to Freschi, both directly and as aiders and abettors, for violations of Rule 10b–5; all defendants except Sherr liable to Freschi for state law fraud; and Bandler & Kass, Werner, Sylvor, and Sherr liable to him for legal malpractice. The jury awarded damages of $440,000 on the legal malpractice claim. For the Rule 10b–5 and state fraud violations, the jury awarded combined damages of $926,346.07, "plus all expenses incurred in both this action and actions before the tax courts plus interest due IRS on any deficiencies, including plaintiff's attorneys' fees." The jury further "suggested" that part of the damage award "be held in some type of escrow account" and awarded only if Freschi, who was challenging the IRS deficiency assessment, ultimately suffered the full tax losses he claimed. On a motion by the defendants, the trial judge rendered judgment non obstante veredicto on the legal malpractice count, and, disallowing that part of the award based on increased tax liability, offered Freschi remittitur of the remaining damage award from $926,346.07 to $266,500, the amount of his investment, plus pre-judgment interest of $126,681.75. Freschi accepted the remittitur offer. Defendants filed a timely appeal to this court, and Freschi filed a timely cross-appeal.[4]

## II.

### A.

The first issue we must address is whether the findings of liability against all appellants on the 10b–5 count, and against all appellants except Sherr on the state law fraud count, can stand. Appellants argue that Freschi's claim against them on these counts was barred by California's three-year statute of limitations for fraud when Freschi filed the action in July 1981.

■ Freschi and the appellants agree that the three-year California statute of limitations for fraud governs both the fraud and the Rule 10b–5 causes of action.[5] They also agree that the causes of action accrued when Freschi discovered the alleged violations or should, upon reasonable inquiry have discovered them.[6] *Arneil v. Ramsey*, 550 F.2d 774, 780 (2d Cir.1977); *Korn v. Merrill*, 403 F.Supp. 377, 387 (S.D. N.Y.1975), *aff'd*, 538 F.2d 310 (2d Cir. 1976).[7] They disagree, however, on the crucial issue of when Freschi should have discovered, upon reasonable inquiry, that he was the victim of a fraud. Appellants assert that he should have become aware of this fact on March 31, 1978, when he received the Grand Coal Venture offering memorandum which, they allege, stated terms materially different from those which he had thought governed his investment. If this claim is accepted, the finding

---

**3.** Prior to trial, the court dealt with various motions; *inter alia,* the court denied Freschi leave to amend his complaint to add a cause of action under the Organized Crime Control Act of 1970 ("RICO"), Pub.L. 91–452, 84 Stat. 941, 18 U.S.C. § 1961 *et seq. Freschi v. Grand Coal Venture,* 583 F.Supp. 780, 787–88 (S.D.N.Y.1984). At the close of the evidence and before submission of the case to the jury, the court directed a verdict for defendants on a breach of contract cause of action.

**4.** Because Freschi accepted the trial court's offer of remittitur, he conditioned his cross-appeal on this court's altering the remittitur offer.

**5.** Rule 10b–5, like many federal causes of action, has no express statute of limitations. Accordingly, the federal courts adopt the most analogous state statute of limitations. Both parties agreed that the statute of limitations for fraud was the most analogous limitations stat-

ute, and further agreed that the law of the forum state, New York, would apply the limitations statute of California, the state of plaintiff Freschi's residence.

**6.** While the federal courts adopt the analogous state statute of limitations in 10b–5 actions, the time at which the plaintiff's cause of action accrues is a question of federal law. *See, e.g., Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir.1979); *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir. 1977).

**7.** A long series of cases establishes the need for due diligence on the part of a plaintiff in order to toll a statute of limitations for fraud. *See, e.g., Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348–49, 22 L.Ed. 636 (1874); *Robertson v. Seidman & Seidman,* 609 F.2d 583, 585 (2d Cir. 1979); *Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir.1979); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975).

of liability must be reversed, as Freschi's time for bringing suit would have expired over three months before he filed suit in July 1981.

The question was submitted by the trial court as a question of fact to the jury, which returned a finding that the three-year statute of limitations did not bar the suit. Appellants do not contend that the trial court erred by submitting the question to the jury as one of fact; we must review this question as one of fact, and can reverse only if we conclude that the jury's finding was not supported by any substantial evidence.

We conclude that there was substantial evidence to support this jury finding, and therefore we affirm it. We have already detailed the rather painstaking investigation Freschi undertook on receiving the offering memorandum. While it is possible that some investors might have undertaken an even more thorough investigation, there was substantial evidence for the jury to find that this investigation satisfied the requirement of due diligence, and therefore to find that the statute of limitations did not bar the claim.

We note that the trial court's charge to the jury with regard to the statute of limitations, while correct in most particulars, placed the burden of proving that Freschi failed to exercise diligence on the defendants. The burden ought to have been on Freschi as plaintiff to prove his diligence as the prerequisite to allowing equitable tolling of the limitations statute. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir.1974); *Long v. Abbott Mortgage Corp.*, 459 F.Supp. 108, 116 (D.Conn.1978). Defendants, however, did not object to this aspect of the instructions at trial, and have not, in fact, raised it as an issue on appeal. We are not convinced that the trial judge's instruction in this regard was such plain error as to war-

rant reversal in the absence of an objection, timely or otherwise, by the parties arguably harmed [8] by the instruction. *See* Fed. R.Civ.P. 51.

B.

Having concluded that Freschi's suit was not barred by the applicable statute of limitations, we now proceed to consider whether defendants' conduct contained the elements of common law fraud and of Rule 10b–5 violations. In doing so, we first consider the elements of each cause of action, and then consider separately whether each party was properly found liable.

SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, states:

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Thus a 10b–5 violation has two essential elements, the use of the mail, an instrumentality of interstate commerce, or a securities exchange facility, and a fraudulent scheme or untrue or misleading statement. Case law has further clarified the prerequisites for a 10b–5 action by a private party,

---

**8.** We say "arguably harmed" because we are not persuaded that the instruction constituted anything more than harmless error, given the evidence for the exercise of due diligence on Freschi's part. Because we base our decision on this point on the lack of an objection, it is unnecessary, however, for us to decide whether the instruction did constitute harmless error, and we refrain from doing so.

and has established that the plaintiff must have been the purchaser or seller of a security, that the deceptive conduct must have occurred in connection with the purchase or sale of the security, and that the defendant or defendants must have acted with scienter. *See generally* T. Hazen, The Law of Securities Regulation § 13.2 (1985).

■ With respect to appellant Werner, the evidence of a 10b–5 violation is overwhelming. Werner repeatedly used the telephone, an instrumentality of interstate commerce, to induce Freschi to invest in Grand Coal Venture. In so doing, he misrepresented to Freschi that the prior Spruce Productions offering was withdrawn because of tax problems. This was a lie, and Werner knew it. The evidence establishes that Werner withdrew the Spruce Productions offering because he was under a court order not to market it. It further establishes that the court order stemmed from activities by a client of Werner's in marketing a similar offering which had aroused the suspicion of the SEC.[9] Werner asserts that the misinformation he gave Freschi and the information he failed to give Freschi were not material. This contention is frivolous. Any reasonable investor would be interested in knowing that the SEC was concerned about possible fraud in connection with a securities offering which the offeror himself described as "basically similar" to the one under consideration for investment. Indeed, if Werner did not consider the fact important, it is difficult to understand why he found it necessary to lie to Freschi about it. Werner not only gave Freschi a false reason

for the change in the leases being offered, but failed to tell Freschi that the source of the new leases was an individual the SEC suspected of fraud. We cannot find that it was unreasonable for the jury to consider these misstatements and omissions material; in fact, we are inclined to think that it would have been unreasonable for the jury to have done otherwise.

Werner's argument that he acted without scienter is just as frivolous. Werner knew that the reasons he gave for the change in the offering were not true, and he knew about the court order which was the real reason for the change; indeed, he had been personally served with a copy of it when he made the false and misleading statements to Freschi.

The only remaining issue with respect to Werner's 10b–5 liability, then, is whether Freschi relied on his statements and whether such reliance was reasonable. Freschi testified that he relied on Werner's statements in making the investment decisions on behalf of the trust, and the circumstances support his testimony. At the time of Freschi's December 15 conversation with Werner, he had decided to invest the trust's funds in Spruce Productions; the offering, however, had been withdrawn. Four days after the conversation, Freschi authorized his agent to investigate Bandler & Kass and, if satisfied, invest the trust's funds in the replacement offering, Grand Coal Venture. Even without Freschi's testimony, the conclusion that he relied on Werner's assurances in deciding to invest in Grand Coal Venture would be compelling.[10]

---

**9.** In *SEC v. American Bd. of Trade, Inc.*, 751 F.2d 529, 540–41 (2d Cir.1984), we held that it was not improper for the defendant in that action to fail to disclose the existence of a preliminary injunction against it to potential investors. The circumstances of that case were very different, however; as we specifically noted, the preliminary injunction in that case was prompted, not by intentional misconduct, but by a bona fide disagreement between defendant and the CFTC as to the interpretation of very technical regulations.

**10.** Appellants contend that the potential profitability of the venture was irrelevant to Freschi's

investment decision, as the trust's only interest, they allege, was in finding a tax shelter. Apart from the fact that only bona fide investments are eligible for tax preferences, this argument is rebutted by Freschi's testimony that he was interested in finding an investment offering both tax advantages *and* a reasonable return. The fact that Freschi took steps, after receiving the offering memorandum, to verify that the leased lands did contain coal supports his assertion that he was concerned with the venture's potential for profit.

The jury was justified in concluding that Freschi's reliance on Werner's statements was reasonable. There was no particular reason for Freschi to suspect that the undertaking was a fraudulent one. No evidence has been presented indicating that Laird's transactions had achieved the sort of notoriety which would have put Freschi on notice that he was dealing with swindlers. Appellants suggest that Freschi ought to have made an independent investigation into whether the leased property actually contained coal reserves. There is respected authority suggesting that such investigation by an investor in mining operations is not necessary. *See Securities & Exchange Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862–63 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 98 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (considering the existence of a private cause of action for investors misled by company misrepresentations as to the presence of mineral reserves without any suggestion that investors should have made their own geological investigations).

Freschi, moreover, did undertake some independent efforts to verify the soundness of the offering, as noted above: he obtained legal and accounting advice and sent an agent to inspect the offices of Bandler & Kass to determine that it was a legitimate law firm. To assert that Freschi's efforts to verify the information he received were insufficient to make his reliance reasonable is tantamount to asserting that he should have suspected fraud from the start. As we have said, we see nothing to indicate that he should, and we do not think the jury was unreasonable in so viewing the case.

Sylvor and Sherr, law partners of Werner, were actively involved in the preparation of the Grand Coal Venture offering. Each was aware of the devious operations of Laird, and each knew of the T.R.O. against Laird and against themselves as Laird's attorneys. While the evidence against Sylvor and Sherr may not have been as overwhelming as that against Werner, it was not reversible error for the jury to find Rule 10b–5 liability on the basis of their conduct. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985).

Bandler & Kass was actively involved in the Grand Coal Venture offering as well. Not only were three of the principals in the venture Bandler & Kass partners who utilized the firm's facilities to market their fraudulent scheme, but Freschi's checks investing funds in the venture were made out to "Bandler & Kass, Special Account," and accepted by the firm for payment to that account. Thus it was not error for the jury to find Bandler & Kass liable under Rule 10b–5. Similarly, the jury did not err in finding 10b–5 liability on the part of Ground Production Corporation, which marketed the Grand Coal Venture units.

■ Defendant-appellant Jack Mitnick was Venture Administrator for Grand Coal Venture. The record is absolutely devoid of any showing that he made any misrepresentations to Freschi, or knowingly assisted anyone else in doing so, before Freschi made the investment in December 1977. Since a misrepresentation is actionable under Rule 10b–5 only if it is made in the course of the purchase or sale of a security, Mitnick cannot be held liable for a 10b–5 violation. The judgment to the contrary must be reversed.[11]

■ Defendant-appellant Baker's role was essentially that of a middleman conveying the leases from Laird to Werner, Sylvor and Sherr. The record establishes that Baker supplied Laird with false geological reports and that the sponsors of the Spruce Productions offering made use of those reports in preparing their prospectus. Baker submitted reports, as president of a consulting firm called Mineral Resources Development, giving Grand Coal Venture his opinion that the leased land contained large quantities of coal reserves. These

---

**11.** Mitnick's conduct as Venture Administrator arguably violated his fiduciary duties to the investors. He was not held liable, however, under any such theory. As noted below, the jury properly held Mitnick liable for fraud.

opinions, of course, turned out to be erroneous. There is evidence, moreover, that Baker knew these representations to be false or acted with reckless disregard as to their truth. For example, his reports indicated that sub-bituminous coal was available on leased land in North Dakota, while it is a well-known fact in geological circles (as an expert witness testified) that there is no sub-bituminous coal in North Dakota. In addition, there were other misrepresentations in Baker's report. For example, he took advantage of the fact that one of his staff geologists had recently married, and therefore changed her name, to give the impression that her reports before and after the marriage represented the independent findings of two different geologists. The evidence also suggests that he overrepresented his own geological qualifications. All of these representations, moreover, were made to the parties marketing Grand Coal Venture prior to the time Freschi made his investment. Although the case as to Baker's liability is a closer one than that as to the other defendants, we think that there was enough evidence for the jury at least to have found Baker to be a knowing aider and abettor of the 10b–5 violations. Accordingly, we do not reverse the judgment as to Baker.

 We now turn to the common law fraud count, on which the jury found all defendants except Sherr liable. The parties agree that the substantive law governing this count is that of New York. As we noted in *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), the elements of fraud in New York are representation of a material fact, falsity of that representation, scienter, reliance, and damages. *Id.* at 80 (*citing JoAnn Homes v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969) and 24 N.Y.Jur., Fraud & Deceit § 14 at 47–48 (1962)). We have discussed all these points in connection with the 10b–5 claim, and it would be repetitious for us to engage in separate discussion here. Our prior discussion of why the jury's findings of 10b–5 liability as to Werner, Sylvor, Baker,

Ground Production Corporation, and Bandler & Kass were proper makes it sufficiently clear why the jury was also justified in finding these parties liable for fraud. We further note that while we reversed the finding of 10b–5 liability as to Mitnick, on the ground that he did not make any misrepresentations prior to Freschi's investment, the record amply demonstrates that he committed fraud by his misrepresentations to Freschi in the course of his administration of the investment, by which he attempted to conceal the worthlessness of Freschi's investment from him. For example, Mitnick signed letters dated August 22, 1978 and March 31, 1979 making representations to participants about Grand Coal Venture's attempts to obtain substitute coal-producing properties. These were knowing false representations on which Freschi relied. He was harmed by these statements, in that they prevented him from taking action sooner to recover his money. Accordingly, we affirm the finding of liability as to Mitnick on the fraud count.

 The final contention of appellants we must address with respect to the findings of liability is that the court committed reversible error by allowing plaintiff's counsel, in closing argument, to refer to Freschi's belief that his leases guaranteed him replacement properties, in spite of the fact that the court had ruled that Freschi could not reasonably have held such a belief. We fail to see how appellants could have been prejudiced by this argument. The heart of the fraud consisted of the misrepresentations concerning the substitution of Grand Coal Venture for Spruce Productions and the attendant cover-up as to the Laird connection and the temporary restraining order. The evidence as to these misrepresentations was overwhelming, and would have been no less so without counsel's argument on an extraneous issue.

We turn now to the question of damages. There is no question that the trust lost its entire investment, the amount of which was $266,500. Before we determine the amount of the trust's damages, however,

we have to consider the effect of any tax consequences. First, we must consider whether the trust's damages must be reduced by any tax deduction obtained as a result of the loss, in light of the principles we recently announced in *Salcer*, 744 F.2d at 935. Second, we must consider whether Freschi is entitled, as he argues on cross-appeal, to damages as a result of any adverse tax consequences which he would have avoided if the Grand Coal Venture had been a legitimate tax shelter.

In *Salcer*, we said:

... § 28a of the Exchange Act [15 U.S.C. § 78bb(a)] ... limits plaintiffs to recovery of their actual net economic loss.... In applying § 28(a) we cannot ignore the substantial economic tax benefits bargained for and realized by plaintiffs.

*Salcer, supra,* at 941. In this case, the trust sustained losses of $266,500 as a result of its investment. Since IRS allowed the trust's beneficiary a $266,500 deduction from ordinary income as a result, however, and since this resulted in a tax savings of $188,682, the trust's actual loss was only $77,818. Application of *Salcer* requires that this actual net loss constitute Freschi's recovery on behalf of the trust.

Freschi argues, on cross-appeal, that his damages should be increased to compensate the trust for tax savings it would have realized had the full deductions been allowed. The district court correctly held that a Rule 10b–5 plaintiff can be compensated only for actual damages, and that any award in compensation for hoped-for tax savings would be an impermissible award of damages arising from an expectation interest. *See, e.g., Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971); *Chasins v. Smith, Barney & Co., Inc.,* 438 F.2d 1167, 1173 (2d Cir.1970). Similarly, the trial court noted that the interest and penalties IRS assessed against the senior

Freschi were not a consequential damage; rather, they were simply compensation to IRS for the use of money IRS would have had if the senior Freschi had not wrongly withheld it. The interest and penalties were not, the trial court correctly observed, really a damage suffered by the senior Freschi at all, but a return by him of what would otherwise be a windfall resulting from his opportunity to use money to which he was not entitled.

## III.

In conclusion, we AFFIRM the jury findings of 10b–5 violations on the part of Werner, Sylvor, Sherr, Baker, Bandler & Kass, and Ground Production Corporation, and the findings of common law fraud as to all the above except Sherr. We REVERSE the jury's finding of liability as to Mitnick on the 10b–5 count, but AFFIRM the judgment against him on the fraud count. We remand, with instructions that the order of remittitur be amended, so that Freschi is offered a choice between damages of $77,-818 (plus pre-judgment interest)[12] and a new trial.

Freschi's cross-appeal asks that, in the event the remittitur is altered, the trial court be instructed to allow him to proceed on legal malpractice, breach of contract, and RICO (18 U.S.C. § 1961 *et seq.*) counts in the event he should elect a new trial. Because we believe that the trial court was correct in granting judgment non obstante veredicto on the first of these counts, directing a verdict for defendants on the second, and denying Freschi leave to amend his complaint to add the third, we deny this request.

The judgment of the district court is affirmed in part and reversed in part. This case is remanded for further proceedings not inconsistent with this opinion.[13]

---

12. In awarding pre-judgment interest only on $77,818, we are assuming that IRS, in charging Freschi interest on the taxes it determined he owed, did not charge interest on tax payments withheld as a result of the $266,500 deduction, which was ultimately allowed. If this assumption is erroneous and IRS did at some point

charge Freschi interest on taxes withheld as a result of the $266,500 deduction, pre-judgment interest should be appropriately increased.

13. Because the attorney-defendants in this case (Werner, Sylvor, Sherr, and Mitnick) committed actions raising serious questions as to their pro-

fessional integrity, and because it is not clear from the record exactly what disciplinary action has been taken against them, we instruct the clerk to send copies of this opinion to the appropriate professional conduct review committees.