In re The **DREXEL BURNHAM LAMBERT GROUP, INC.**, et al., Debtors.

**SUPER BOWL CORPORATION LIMITED, Appellant,**

v.

**DREXEL BURNHAM LAMBERT INCORPORATED, Appellee.**

Nos. 92 Civ. 7183 (MP), 92 Civ. 7184 (MP).

United States District Court, S.D. New York.

March 3, 1993.

---

Hornsby, Sacher, Zelman & Stanton, P.A. (Barton S. Sacher, P.A., of counsel; Nancy Van Sant, with him, on the brief), Miami, FL, for appellant Super Bowl Corp.

Tenser, Greenblatt, Fallon & Kaplan (Joel D. Leifer, of counsel; Mark H. Moore, Daniel Hume, David L. Wagner and William H. Devany, with him on the brief), New York City, for appellee and cross-appellant, Drexel Burnham Lambert Inc.

MILTON POLLACK, Senior District Judge:

### Preliminary

#### I.

This case arises out of the euphoria created in the securities markets in 1987 which was followed by an unprecedented market crash on October 19, 1987 when the Dow Jones Industrial Averages plunged more than 500 points. The Super Bowl securities account with Drexel held in addition to equity stocks a vast number of uncovered short puts (options) which registered huge losses in the market crisis. By the claims filed in the bankruptcy proceedings, Super Bowl sought to shift these losses to the broker's bankrupt estate.

Super Bowl is a family corporation based in Mexico City, Mexico. The Super Bowl account was operated by its President, Mr. Abraham Silberstein. Drexel's customers' representative on the account was Martin Askowitz; his assistant was Marilyn Berry. It will serve a better understanding of the trial if an outline of the significant factual findings by the trier of the facts precedes a more complete statement of the record based on those findings. At the inception of the trial, counsel for Super Bowl gave the following outline of his case:

By Mr. Sacher:

(a) "our case is a negligence action for a failure to execute a sell order on the 7th of October";

(b) "the period of time roughly from the spring to the 19th of October, sets forth a relationship between Mr. Silberstein on behalf of Super Bowl and Mr. Askowitz of trust, confidence and reliance on his personal expertise";

(c) "[Askowitz] did not tell his clients he was leaving [on vacation] until a few days before he left for the trip so as not to upset them ... those facts ... gives us the four corners of a fraud claim under New York law, a securities fraud claim under 10(b)(5), as well as ... a breach of fiduciary duty under New York law, in addition to the core negligence claim."

#### II.

### The preliminary consideration of the issues to be tried

Shortly before inception of the trial, Drexel moved for an order granting Drexel partial summary judgment with respect to the federal securities claims, common law fraud claim, breach of fiduciary claim and negligent misrepresentation claim, asserted by Super Bowl. The motion was based on the Super Bowl Proof of Claim, Super Bowl's opposition and response to Drexel's objection to the proof of claim, excerpts from transcripts of the pretrial depositions of Abraham Silberstein and of Martin Askowitz, and the transcripts of an arbitration proceeding between Super Bowl against members of Drexel, copies of statements of Marilyn Berry and Martin Askowitz, statements of the Super Bowl account for September, October and November 1987 and stipulations dated January 21, 1992 and June 12, 1992.

The Rule 13(h) statement pursuant to the Local Bankruptcy Rules set forth Drexel's

version of the events in the Super Bowl relationship and account with Drexel.

Super Bowl submitted its opposition to Drexel's 13(h) statement indicating what it believed raised a genuine issue to be tried. It also supplemented the documentary data to be considered by the Court.

In briefs submitted on the motion for partial summary judgment, Drexel argues, *inter alia:*

1) No violation of section 10(b) was involved

a) alleged misrepresentations and omissions were not made "in connection with" the purchase or sale of a security

b) the *scienter requirement was not* satisfied

c) the alleged misrepresentations and omission are not material

d) loss causation was not and could not be established

e) no reliance was placed by Super Bowl on any misstatements or omissions.

Additionally, Drexel argued that no deceitful intent was involved so no breach of fiduciary duty could be asserted and that the common law claims of fraud and misrepresentation could not be sustained as there was no causation.

In opposition, Super Bowl asserted as genuine triable issues of material fact that "While Super Bowl's 'failure to execute' (viz., orders to sell out Super Bowl's account on October 7, 1987, not part of the partial summary judgment motion) are an essential part of Super Bowl's case, Drexel largely ignores an additional cause of action set forth in Super Bowl's Proof of Claim stating that 'Askowitz was taking a long-planned approximate one-month vacation to Israel in the relatively near future and would be unavailable to closely supervise, monitor and service the positions in the Super Bowl account.'" That alleged essential part of its case (which the motion for partial summary judgment addresses) was elaborated in its brief as:

1. "failure to disclose that the account would be turned over to a mere trading assistant while Askowitz was in Israel, based upon which Super Bowl relied in making numerous securities purchases, particularly in September 1987 are actionable under Section 10(b) of the Exchange Act;

2. "The deposition testimony of Mr. Silberstein that he personally believed Marty Askowitz was only 'negligent' does not foreclose a finding of scienter or intent on the part of Askowitz ... Askowitz's vacation had been planned as early as June 24, 1987 and paid for by September 14, 1987, ..."

The Bankruptcy Judge carefully analyzed the supposed triable issues cast up by Super Bowl and made the following findings of fact, ruling that only alleged negligence and breach of contract contentions of Super Bowl remained to be tried, albeit that the other supposed issues mentioned above were nevertheless reiterated and ventilated by Super Bowl on the trial itself and merged into the ultimate findings of fact and conclusions of law.

"The Court: Counsel, in reference to the motion for partial summary judgment, I'm going to grant the motion for any number of reasons which I will state on the record, and what will remain is simply a negligence claim. It is very clear from the facts of this case, and I've gone through the exhibits which were presented and the deposition testimony, et cetera, and I think the parties have also stated this on a number of occasions, what has really happened here is what happened in the space of maybe a couple of days or a couple of hours between Super Bowl and the account representative, but partial summary judgment is appropriate with the pleadings, depositions, answers to interrogatories, admissions, together with the affidavits to show that there is not genuine issue of fact, material fact and that the moving party is entitled to judgment as a matter of law. And as counsel for Drexel has indicated, that they bear the initial burden of demonstrating the absence of a genuine issue of material fact, it discharges this burden by demonstrating to the Court that there is an absence of

evidence to support the claims, whether Super Bowl has the burden of proof.

\*   \*   \*   \*   \*   \*

"There are many, many claims by Super Bowl, but if you just take the proof of claim that was submitted, that alone on its face really shows that this is a negligence and a breach of contract. And I think that Super Bowl, taking all of the evidence as a whole, and I'm talking about the material evidence, I think really fails to establish a violation under Section 10(b) of the Exchange Act, or Rule 10(b)(5). I don't think the misrepresentations or admissions were made in connection with the sale of the security, purchase or sale. At most it was puffery. I think your client was sophisticated and knew that.

\*   \*   \*   \*   \*   \*

"Second of all, there's no satisfaction of a scienter requirement there, and I think those words came out of your own client's mouth, at least the principal of the client, in the depositions. And any misrepresentations or omissions are certainly not material. Moreover, there's a failure even to establish any loss causation in reference to these types of claims.

\*   \*   \*   \*   \*   \*

"Moreover, I don't think again, and I think this comes from your client's own deposition testimony, that there really was no deceitful intent here. This is clearly a negligence and breach of contract case, and on the basis of that I think it follows a fortiori that the common law claims of fraud and negligent misrepresentation must be dismissed.

\*   \*   \*   \*   \*   \*

"So the only thing that is really here before us is the breach of contract and the negligence on behalf of Drexel. So the motion for partial summary judgment is granted.

\*   \*   \*   \*   \*   \*

"... the remaining issues to be resolved by the court pertain to negligence and breach of contract ..."

## III.

*The findings on the remaining matters*

By the Court:

"The crux of this case really is a case of credibility"

\*   \*   \*   \*   \*   \*

"I think there's no doubt that Mr. Silberstein wanted personal service, I think ... that he received this service ... I think every stockbroker in the world promises and swears that they will provide the best service ever, and many professions do that. But I don't think that rises to the level of a contract, but I think it rises more to market puffery.

\*   \*   \*   \*   \*   \*

"[B]ased upon Mr. Silberstein's testimony ... I think it's clear that he was many, many times the driving force behind this account. I think that it's true that he did rely upon Mr. Askowitz ... he learned a lot from Mr. Askowitz ... he grew to have his own level of sophistication ... he recognized his own sophistication and that he did control many of the trades. I think there's a very big difference between listening to someone's advice and then coming to your own conclusion, and I think many times that was what was done here, he used Mr. Askowitz for this, and I think that he was well aware of what was going on in the market.

\*   \*   \*   \*   \*   \*

"It's clear that Drexel Burnham kept him informed about his account

\*   \*   \*   \*   \*   \*

"Then we come to the event of Mr. Askowitz's vacation. I think it is very, very clear that Mr. Silberstein is an optimist. He has a very positive view of things, in the stock market they call that a bullish mentality, that the market will rise, and based upon a review of his positions which this court has done very, very carefully, it's clear that he was poised in the stock market for a rise in the stock market during the period of time in question. This, however, is a risky position and he used his judgment to hedge by

using the three-prong strategy that Mr. Askowitz referred to. And here the testimony as to that strategy in reference to buying short and long to cover your positions.

\*    \*    \*    \*    \*    \*

"I think the testimony is very consistent that he didn't want Mr. Askowitz to go on vacation ... I think that in terms of executing trades I find that Ms. Berry was perfectly capable of executing trades.

I think that the stock positions were sold [on October 7, 1987], I think the parties testified that that was their plan, that she [Ms. Berry] then started selling the short positions and the other positions in an alphabetical order. I think it was the long positions in an alphabetical order.

\*    \*    \*    \*    \*    \*

So I think it's clear that she started to execute the program that the parties had agreed to in the telephone conversation which occurred on October 7th....

\*    \*    \*    \*    \*    \*

It's also clear that Ms. Berry stopped the program and I think that it stopped sometime probably just before noon ... it defies common sense, and I think that's the key here, that Ms. Berry would just stop a program when in most respects, ... that she would just stop, it defies common sense ... and I think at that point in time he [Silberstein] took control of his account ... I think Mr. Silberstein said ... I'm going to take control of my own account and ... Ms. Berry believed that ... [there] was a countermand of an order, and I think that's a fair understanding and I think she behaved that way. We then have testimony for several days and evidence which indicates that Mr. Silberstein claims that he told her to sell out my account, but in point of fact, he was doing roll downs in order to protect himself from what he perceived was going to be a large margin call which he could not bear.

\*    \*    \*    \*    \*    \*

I find that Drexel was not negligent, and if they were, any negligence whatsoever was certainly eliminated by Mr. Silberstein taking over the management of his own account.

\*    \*    \*    \*    \*    \*

I think it's clear he was sophisticated and I think he was making his own trades and on that basis there was no breach of contract and no negligence.

\*    \*    \*    \*    \*    \*

Now in reference to the supervisory practices ... there is really no evidence as to churning ... I don't find that there was any supervisory negligence on behalf of the officers at Drexel"....

IV.

*The circumstances supporting
the findings*

In greater detail, and based on the foregoing essential findings the record on appeal presents the following background.

Super Bowl had been doing business with Drexel from 1983. In the summer of 1987, Silberstein decided to transfer Super Bowl's brokerage account with Charles Schwab to Drexel and to place it under the supervision of Martin Askowitz, a customer's representative and an acknowledged expert in put and call options trading. Askowitz promised constant personal attention, monitoring and necessary supervision of the account. Askowitz had been informally advising Silberstein on his trading of options conducted by Silberstein through Charles Schwab & Co., another securities broker. The Super Bowl account was received and was always maintained at Drexel as a non-discretionary account, Silberstein always maintaining control and direction of its securities transactions.

From inception, Silberstein and Askowitz talked stocks and options at least four to eight times a day on the telephone, virtually every business day and into the evenings and weekends from their homes and elsewhere.

Silberstein frequently followed recommendations from Askowitz but the trading

instructions and orders to the brokers for the account were always his.

In September, 1987, undoubtedly spurred by a palpably bullish view of the future course of the market, Silberstein materially increased the number and size of the option transactions and positions in the account. Super Bowl had sold a large quantity of uncovered short put option contracts, in effect gambling on the continuance of the upward surge of the securities markets and impliedly wagering that the short put options which had nearby maturities would not be called before they expired.

On or about October 2, 1987, the day before the Jewish holiday of Yom Kippur, Askowitz, an Orthodox Jew, told Silberstein, a Secular Jew, that he and his family were about to vacation during the brief holiday period in Israel. This was a planned vacation for Askowitz. Silberstein sought to dissuade Askowitz from taking this vacation but the latter promised to keep in telephone contact with his office and would continue to supervise his able assistant, Ms. Marilyn Berry, during his absence, and assured Silberstein that other supervision and assistance was also available from the office manager and others in the office if called upon. On prior occasions when Askowitz was physically away from the office, Silberstein would place an order for the Super Bowl account with Ms. Berry, a registered representative. The latter would provide Silberstein with quotations but gave no advice on strategy; she did not suggest the purchase or sale of securities, options or combinations thereof.

Silberstein was an extremely sophisticated investor on his own with a net worth of $150 million approximately. He had been an active participant in the commodities and securities markets for decades, having purchased and sold common stocks, dealt in certificates of deposit, bonds, stocks and index options, foreign currency and futures. He had maintained brokerage accounts with the cream of Wall Street: Prudential Bache, Shearson Lehman, Merrill Lynch, Paine Webber, Charles Schwab, Morgan Stanley, Kidder, Peabody, and Drexel.

Silberstein owned and operated export-import, mining construction and manufacturing businesses and is a major shareholder and member of Banamex, the largest commercial bank in Mexico and member of the board of directors of Bancomer, the second largest commercial bank in Mexico. He is a man described to be highly opinionated and confident of his judgments, which swept all advice before him.

Silberstein always maintained non-discretionary trading accounts. He did not commit market decisions on his behalf to others. He alone made his trading decisions. He sought advice—but the judgments and decisions on trading were solely his. He both understood and was not afraid of investment risks.

On the morning of October 7, 1987, at about 10 a.m. (New York time) after a down market on the previous day, Berry, at Silberstein's request, arranged a conference call with Askowitz in Israel, herself in New York and Silberstein in Mexico City. During a lengthy conversation, on Askowitz's recommendation, Silberstein decided to liquidate, at the market price, all of the short option positions (puts that he had sold) together with his other puts and calls long in the account, as well as his stocks other than stock in Gerber Foods, Eli Lilly and Fannie Mae. The orders were to be entered as "at the market" orders. Askowitz recommended and Silberstein accepted his recommendation that the sequence of liquidation should be 1) to sell stocks first; 2) to close out short puts next in alphabetical order and 3) then to close out the remainder of the options; and Silberstein agreed and issued the instruction to proceed accordingly and Berry was so informed.

The market had been off on October 6th by approximately 90 points on the Dow Jones Industrial Averages. But by late morning of October 7th, the market gave signs of stabilizing, and indeed actually closed slightly up in price for the day.

Shortly after Berry began executing the sale of the stocks and just about the commencement of closing out some short puts at the market, Silberstein phoned Berry

and, according to Berry, he told her that he had changed his mind and was cancelling his instructions with respect to wholesale liquidations at the market; and that he no longer wished the indiscriminate covering of his options at the market but instead, before closing out any more of the short options he desired to consider separately, one by one, the facts pertinent to the security under option as well as the option on which he was obligated relating thereto and that he would on the basis thereof decide "as to which ones to cover and which ones to leave alone" (Berry's testimony). On this countermand the proposed sell-out was immediately stopped—Berry was given no alternative—and the laborious and time-consuming process of considering the investment facts pertinent to each option and its related stock and waiting for his instruction whether to cover or not cover the option went on for most of the day thereafter. The evidence was that Berry and Silberstein would discuss every position from inception to include treating the stocks as the underlying security in conjunction with the options upon them. Then, "he instructed me exactly which ones he wanted to cover, and which ones he wanted to hold", said Berry. Interestingly, the earliest closeout order ticket shows that it was entered and closed out "at the market" price by circling the word "market" printed on the order ticket. The order tickets for transactions after the countermand show no entry thereof for coverage "at the market" but show they were entered as "day" orders; this is evidenced by the circling of that printed rubric on the order ticket and then a price is stated which is circled.

The order tickets to close out options on the next seven trading days, October 9, 12, 13, 14, 15 and 16th, also were similar tickets, bearing notations that each was entered as a day order, a price was stated and then circled, presumably when reported by the order department. None of these later closeouts was recorded on the order ticket as entered as at the market orders.

Silberstein, in his testimony, denied giving the countermand and denied Berry's testimony that they reviewed each option and denied he gave her the instruction that day and the next six days "which ones to cover and which ones to leave alone," "which ones he wanted to hold." The trier of the facts did not credit those denials.

On October 8th the Dow Jones Industrial Averages were lower again and on October 9th Silberstein told Berry that it was imperative that he speak with Askowitz; that he would be at his Acapulco residence on Sunday, October 11th and wanted a telephone call there from Askowitz. Askowitz phoned Silberstein from Jerusalem on Sunday as requested, and learned from Silberstein that the October 7th orders had not gone forward as market orders.

Askowitz spent about 70 minutes with Silberstein on the telephone from Jerusalem to Acapulco. During the call he asked Silberstein why his positions had not been closed out at the market on October 7th as agreed in the lengthy phone talk on that day. The spurious answer he got was that Berry did not have any expertise in closing out options and that Askowitz had to come back and close out his position. Askowitz replied that he would speak to Berry in the morning and get back to Silberstein. Askowitz did phone Berry on the 12th and learned of the countermand on October 7th and the substitute procedure that Silberstein had ordered to be followed and the selective covering of options. Silberstein and Askowitz did not talk again until he returned to New York on the following Monday, October 19th. In the intervening few days Silberstein continued in control of his transactions and ordered certain "rolldowns" to be made in his account; this constituted buying back options about to expire and selling options on the same stock with the same striking price with a longer expiration date. Those roll-outs simply kept Silberstein in the market, manifesting thereby his chronic bullish frame of mind on the course of the market.

After the Sunday talk with Askowitz, Silberstein continued his dialogue with Berry from Mexico City each hour or so until on Thursday, October 15th when Silberstein went to Las Vegas and they continued to talk about two or three times a day

from Las Vegas when Silberstein would contact her. All this time the market kept gyrating and options in the account were being covered or liquidated on Silberstein's instructions. The ledger of the account reflects these transactions.

Drexel, in accordance with its practice, delivered Super Bowl's daily Trade and Positions Sheets to Silberstein via DHL to Mexico, several times and also to Las Vegas to Caesar's Palace as well as sending him special sheets which reflected all his positions.

## V.

### *The Market Collapse*

The deluge on October 19, 1987 brought about substantial margin selling in the Super Bowl account. Silberstein had withdrawn huge amounts of cash from the account in the preceding weeks, $1,875,000 was wired to his bank in Los Angeles by Ms. Berry on October 6th, and $375,000 was wired to him by her on October 9th, 1987.

Upon arriving in New York on Black Monday, October 19th, Askowitz was in frequent contact with Silberstein in order to liquidate his positions to meet impending margin calls created by the crash and the cash withdrawals. After analyzing Berry's documentation for the Super Bowl account during his two weeks physical absence from the office, Askowitz concluded that several new positions had actually been added by Silberstein keeping certain positions alive through Silberstein's rolldowns by which he thereby remained in the market.

## VI.

As a postscript to the foregoing, several interesting admissions emerged from Super Bowl's counsel, Mr. Sacher, during the argument of the appeal which may be worth noting as they bear on and corroborate the findings and conclusions reached by the Court below.

The Court inquired of counsel whether it was appellant's position that the physical presence of Askowitz at his office was bargained for as a condition of submitting the bulk of his accounts to Drexel. Counsel's response was

"not his physical presence but his presence either on the scene or by telephone from his home or wherever he was, was bargained for, that this person, this expert, would daily supervise this account. That was what was promised, that was what was expected ... It didn't matter if he was in New York or in Israel ..."

Again by the Court:

"the point of the matter is that Mr. Askowitz was reasonably available during that period of time, and the supposed lengthy visit of his to Israel during the holidays was not for an indeterminate time and to the preclusion of telephone consultation. Isn't that correct?

By Mr. Sacher:

"That is correct ..."

By the Court:

"At any time in the business transactions that were discussed here, did Askowitz have discretionary trading authority?"

Mr. Sacher:

"No."

By the Court:

"Was Silberstein in touch with Drexel at any time on October 8? [Same question asked about October 9, 12, 13 and 14]

Mr. Sacher:

[In each case] "Yes, sir."

## VII.

Super Bowl raised fraud related claims. These fall to the ground because the evidence gathered before and submitted at the inception of the trial showed that Silberstein had repeatedly conceded that Drexel had no fraudulent intent and that promised attention to the customer's account were the customary assurances expected from every sales person that do not support a claim of breach of fiduciary duty or negligent misrepresentation.

■ Super Bowl was neither a defrauded purchaser of stocks and options or a defrauded seller. Its supposed injury did not stem from any trading that Drexel did. No

tortious conduct of Drexel actually caused harm to Super Bowl. A brokerage account investor bringing a securities fraud claim cannot complain about a fraud that did not cause it any harm.

In short, the Super Bowl claims spelled out as federal securities violations, do not fall within the zone of interests protected by the federal statutes under which Super Bowl seeks relief.

Silberstein flatly conceded that there was no scienter on the part of Askowitz or Drexel and plainly there was no showing that failure to advise Silberstein of Askowitz's vacation plans was a proximate cause of any damages to Silberstein who was entirely free to submit orders to or withdraw from Drexel at all times.

In his deposition made part of the record Silberstein asserted

"I really think Askowitz, the only wrongdoing of him was the negligence of going away after taking such a big account and such big positions."

Askowitz testified that he told Silberstein of his availability during his holiday:

"I said Abraham, I'll do anything you want me to do. I said the people who are in the office will continue to be in the office. I have every intention of being in perpetual contact with the office. It wasn't that I was going to a country that had no telephone communications."

Again, in the record before the Bankruptcy Judge:

"Q: ... you are not accusing Marty Askowitz of intentionally defrauding you?

"A: No, no, no ...

"Q: Do you think Marty Askowitz ever did anything to intentionally hurt you?

"A: No."

The resolution of the issues depended on an assessment of the credibility of the witnesses. Having considered their testimony and all the documentary data bearing thereon, the probabilities, the circum-stances and the motivations, the findings reached were not an abuse of discretion. The record supports the rulings of the trier of the facts.

Bankruptcy Rule of Procedure 8013 provides that:

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

The authorities are legion, in a variety of contexts, that the facts of this case do not support a legal claim of federal or common law fraud.

Super Bowl's losses were proximately caused by Silberstein's decision to countermand the sell-out order on October 7, 1987 and to retain certain positions in the account from October 7 and day to day to October 19. As the Second Circuit aptly expressed it in another connection:

[t]he loss at issue was caused by the Bennett's own unwise investment decisions, not by U.S. Trust's misrepresentations.

\* \* \* \* \* \*

allegations concerning misrepresentations ... fail to establish the necessary loss causation; there is simply no direct or proximate relationship between the loss and the misrepresentation.[1]

*Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 314 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

■ "In order to prove a claim under section 10(b), or Rule 10b–5, a plaintiff must show ... that the defendant, with scienter, made a misrepresentation of material fact or failed to disclose a material

---

**1.** As stated by the Second Circuit Court of Appeals in *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 967 F.2d 742, 747 (2d Cir.1992), the causation analysis in a Rule 10b–5 claim is analogous to that of a common law tort claim:

"The causation analysis encompasses two related, yet distinct elements—reliance and causation—elements that, in effect, correspond respectively with common law notions of "but-for" and proximate causation."

fact, and that the plaintiff relied on the misrepresentation or omission and suffered a loss as a result of the misrepresentation or omission." *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992). The elements of a Rule 10b–5 claim are similar in substance to those of a claim for common law fraud, but Rule 10b–5 additionally requires the fraudulent activity to be conducted "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

Courts in this Circuit have held that "[m]isrepresentations or omissions involved in a securities transaction, but not pertaining to the securities themselves, cannot form the basis of a violation of Section 10(b) or Rule 10b–5." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.*, 770 F.Supp. 176, 181 (S.D.N.Y.1991) (Connor, J.); *see also Pross v. Katz*, 784 F.2d 455, 459 (2d Cir.1986) (defendant's fraudulent acts must be "integral to the purchase and sale of the securities in question"); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 941–44 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (incidental involvement of securities as collateral for loan obtained through misrepresentation regarding financial condition of company was insufficient to meet "in connection" requirement); *Moran v. Kidder Peabody & Co.*, 617 F.Supp. 1065, 1068 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986) ("misstatements [that] are of a general nature and not in reference to any particular security" can not support a claim under Rule 10b–5).

■ In this case, the complaint is that were an account to be opened it would be serviced diligently; that can not be connected to any particular subsequent transactions and such general misrepresentations can not support a Rule 10b–5 claim. *See McCoy v. Goldberg*, 748 F.Supp. 146,

150 (S.D.N.Y.1990) (an experienced broker's general statement in an effort to get business that he would personally handle plaintiff's account did not support federal securities fraud claim, which must pertain "to the value or quality of any specific security"); *Siegel v. Tucker, Anthony & R.L. Day, Inc.*, 658 F.Supp. 550, 553 (S.D.N.Y.1987) (same). Furthermore, the alleged misrepresentation or omission can not be linked to the alleged failure to sell-off Super Bowl's account in October 1987, because a failure to execute a purchase or sale order is not "in connection" with the purchase or sale of securities. *See Moran v. Kidder Peabody & Co.*, 617 F.Supp. 1065, 1067 (S.D.N.Y.1985).[2] We accordingly affirm the Bankruptcy Court's finding that, in spite of Silberstein's claims that the alleged misrepresentations induced him later on into making numerous securities purchases, there is an insufficient connection between the alleged misstatements and any Super Bowl transactions.

■ Even if Super Bowl's contention were credited that the alleged misrepresentations and omission influenced its decision to purchase certain options, such purchases could at most be a "but-for" cause of the losses sustained in the October 19 stock market crash, and therefore cannot support Super Bowl's claim under Rule 10b–5. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir. 1985) (in Rule 10b–5 claim, the "required causal connection may not be supplied by "but for" allegations").

■ Super Bowl's common law fraud claim suffers from the same infirmities as its Rule 10b–5 claim. Under New York law, "[t]he elements of common law fraud are a material false misrepresentation, an intent to defraud thereby, and reasonable

**2.** Super Bowl relies heavily on *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). In that case, a trainee at a brokerage firm misrepresented his expertise by claiming he was a fully-qualified broker and a portfolio management specialist in order to induce plaintiffs to invest in particular securities. However, as the Court of Appeals pointed out in *Bennett v. United States Trust Co. of New York,*

770 F.2d 308, 314 (2d Cir.1985), the broker's alleged misrepresentations in that case related directly to the value of particular securities in a particular transaction. In contract with *Marbury,* the general misrepresentations and omission alleged by Super Bowl in the present case do not related to the value of any particular securities and do not pertain to a particular purchase or transaction.

reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987). Each element must be established by clear and convincing evidence. *Id.* Under this standard, Super Bowl's common law fraud claim fails to raise a triable issue of fact with respect to causation, scienter, and materiality. *See Bennett*, 770 F.2d at 316 (affirming dismissal of common law fraud claim on same basis as 10b–5 claim); *Freschi v. Grand Coal Venture*, 767 F.2d 1041, 1050 (2d Cir. 1985), *rev'd on other grounds*, 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986) (applying Rule 10b–5 findings to adjudication of common law fraud claims); *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (comparing Rule 10b–5 claims to common law fraud claims).

■ An action for breach of a fiduciary duty also "requires a showing of 'deceitful intent' on the part of the fiduciary" and no evidence supporting a deceit was shown, to the contrary, Silberstein himself negated any purpose to deceive on the part of Askowitz. *See Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991).

■ Super Bowl claims that an issue of fact existed whether Askowitz's failure to inform Silberstein of his vacation and his promises of constant, personal attention constituted negligent misrepresentation. Under New York law, the elements of negligent misrepresentation are: (1) carelessness in imparting words, (2) upon which others were expected to rely, (3) upon which they did act or failed to act, (4) to their damage, and (5) the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound to by some relation or duty of care. *White v. Guarente*, 43 N.Y.2d 356, 362, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977); *Rotanelli v. Madden*, 172 A.D.2d 815, 569 N.Y.S.2d 187, 188 (2d Dep't 1991), *appeal denied*, 79 N.Y.2d 754, 581 N.Y.S.2d 281, 589 N.E.2d 1263 (1992).

No evidence to support such a contention was adduced directly or by inference.

Moreover, Super Bowl's negligent misrepresentation claim suffered from infirmities with respect to the materiality of the alleged misrepresentations, and lack of proximate cause.

## VIII.

*Costs are due to the prevailing party*

■ Bankruptcy Rule of Procedure 7054(b) provides that:

The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.

Drexel prevailed on all issues. No equitable reason appears for taxing the bankrupt estate for the expense of a trial in which it was, as here, put to great expense and costs and prevailed.

Drexel should be awarded its costs of suit to be taxed by the Clerk to the extent permitted by Rule 7054. The denial of costs is reversed.

## IX.

The remaining contentions of appellant have each been considered and found lacking in merit.

Judgment should be entered in the Bankruptcy Court consistent with the foregoing.